**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                        CASE NO.  3:11-cr-248(S1)-J-34TEM

DONALD MITCHELL
_____

## REPORT AND RECOMMENDATION[1]

### I. Status

This case is before the Court on two motions to suppress evidence that were filed by Defendant Donald Mitchell (*see* Doc. #52, "First Motion;" Doc. #55, "Second Motion"). The First Motion seeks suppression of any evidence derived from the seizure of the vehicle that Defendant had parked on December 28, 2010, the day of his arrest, claiming such evidence would be "fruits of the poisonous tree."  First Motion at 1.  The Second Motion seeks to suppress all records obtained from the law office of Amy Newby, Esq., as well as "all communications made by the Defendant to Amy Newby . . . during the course of the representation of the Defendant" and "all evidence obtained subsequent to the aforesaid seizure and testimony as fruits of the poisonous tree."  Second Motion at 1.  The Government has responded in opposition to both motions (*see* Doc. #66, "First Response;" Doc. #67, "Second Response").

The motions to suppress were referred to the undersigned by the Honorable Marcia

---

[1]As a matter of course, within fourteen (14) days after service of this document, specific, written objections may be filed in accordance with 28 U.S.C. § 636, Rule 59, Federal Rules of Criminal Procedure, and Rule 6.02, Local Rules, United States District Court, Middle District of Florida.  Failure to file a timely objection waives a party's right to review.  Fed. R. Crim. P. 59.

Morales Howard for issuance of a report and recommendation.[2]  The Court held evidentiary hearings on May 31, 2012 and June 20, 2012.  Transcripts of the proceedings have been filed (Docs. #127 and #137) (hereinafter referred to as "Tr. 1" and "Tr. 2", followed by the appropriate page number).[3]

Upon consideration of the argument from counsel and the evidence presented, the undersigned recommends the motions to suppress **be denied**.

## II.  Background

On September 29, 2011, a grand jury returned a seven count Indictment (Doc. #1) charging Defendant Donald Mitchell (hereinafter referred to as "Defendant" or "Mitchell") with mail fraud, conspiracy to commit mail fraud, and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343, and 1349.  The Indictment also alleges there is property, real or personal, that is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).  The nature of the alleged fraud centers around an investment scheme devised, or intended to be devised, by Mitchell.  A Superseding Indictment was returned on April 25, 2012 (Doc. #89). The Superseding Indictment reduced the number of counts to four, although the same statutory violations were alleged in the Superseding Indictment as were alleged in the

---

[2]Hearings on the motions were delayed by Defendant's request for new counsel and the time needed for the new attorney to prepare.

[3]Also contained within the record are the transcripts of telephone calls played during the evidentiary hearings (*see* Doc. #134).  The calls between attorney Amy Newby and Donald Mitchell, while Mitchell was incarcerated at the Duval County Jail on December 31, 2010 and January 1, 2011 are transcribed (Doc. #134-1, #134-2), as are the portions of the calls placed by Donald Mitchell to Special Agent Lawrence Lomonaco on February 9 and February 10, 2011 that were played during the hearings (Doc. #134-3, #134-4, #134-5).

original Indictment.

Defendant seeks to suppress all evidence seized from the vehicle he had driven on the day of his arrest, any materials obtained from the Law Office of Amy E. Newby, P.A., who was Defendant's legal counsel at the time of his arrest, and any statements recorded in telephone conversations between himself and Amy Newby during Defendant's incarceration subsequent to the December 28, 2010 arrest.  *See generally*, First Motion and Second Motion.  Defendant claims the search of his vehicle and the seizure of property from the vehicle was unlawful and was made without his consent.  First Motion at 2. Defendant further claims legal files containing attorney/client privileged communications were seized from Newby's office "without a warrant and by threatening a law firm employee . . . ."  Second Motion at 2.  Defendant requests suppression of the documents obtained from the legal files and the recorded conversations between Newby and himself on the basis this evidence was obtained in violation of Defendant's attorney/client privilege.  *Id.*

The United States argues the detention and search of the Maserati that Mitchell had parked on December 28, 2010 were conducted according to well established police procedures,  the search of the property from the vehicle was not conducted until consent had been given, there were no records of any type obtained from Newby's law office, and the recorded conversations fall outside the ambit of attorney/client privilege.  *See generally*, First Response and Second Response.  The United States specifically claims the vehicle was correctly seized as evidence of one of the state crimes for which Mitchell was arrested on December 28, 2010, and the subsequent vehicle search was an inventory search conducted pursuant to policy and procedures of the Jacksonville Sheriff's Office.  First Response 1, 4-6.  Additionally, the United States argues proper consent was obtained for

3

the search of the property found within the vehicle.  *Id.* at 7.  The United States asserts the communications Mitchell seeks to exclude are either not privileged or fall within the crime-fraud exception to attorney-client communications, and there were no records obtained from Newby, her law office or her legal staff (Tr. 2 at 46-53, 79).  *See also* Second Response at 7-8.

Notably, Defendant does not raise a *Miranda* challenge.  Nor, does Defendant attack the arrest itself (*see* Tr. 234).  Rather, Defendant argues that the towing of the Maserati was undertaken as a pretext to further the federal investigation that led to the fraud charges in the present Indictment (*see* Tr. 1 at 51, 234-35).

Upon consideration of all the evidence presented and the arguments made, the Court makes the following findings of fact and conclusions of law.

### III. Findings of Fact

Amy Newby began to represent Mitchell as an attorney in approximately April 2010, when she was retained to defend him against a State charge of grand theft auto.  Second Response at 2.  In July 2010, Newby assisted Mitchell in the purchase of one or more luxury vehicles by providing letters under her signature as the "Estate Manager" for Donald H. Mitchell.  These letters purport to outline vehicle purchases made on Mitchell's behalf by a representative from Newby's office.  *See* Gov't Exs. 14, 15, 16.  In order to arrange for the purchase of an expensive Mercedes-Benz vehicle for Mitchell, Newby overstated the income of the "representative" from her law firm, who was designated to purchase the car on Mitchell's behalf (Tr. 2 at 75-77, 121; Gov't Ex. 15).  Arguably, Newby was Mitchell's attorney of record when he was arrested in December 2010 (Tr. 2 at 11-12).  Newby testified she considered Mitchell a client until February 2011.  *Id.*

4

Also during July or August 2010, Mitchell came to the attention of local law enforcement officials through the monitoring of outgoing phone calls made by Mitchell while incarcerated at the Duval County Jail (Tr. 1 at 10, 30-31, 114-15).  Prior to monitoring his phone calls, correctional officers at the jail noted what they deemed to be unusual behavior of Ms. Amy Newby (Tr. 1 at 220).  During that period of time, Mitchell had been transferred from federal prison, where he was serving a sentence, to the Duval County Jail so that he could testify as a witness in a separate State case.  *Id.*  Ms. Newby came to visit Mitchell for approximately two hours "every single day," which the correctional officers thought was odd.  *Id.*  Thus, an investigation into Mitchell's activities commenced. The direction Mitchell's investigation would take, however, was not fully known and JSO personnel contacted the Federal Bureau of Investigation (FBI), which in turn contacted Special Agent Lawrence Lomonaco of the United States Secret Service because Lomonaco had prior knowledge and a history of dealing with Mitchell (Tr. 1 at 33, 114-15).  The three law enforcement agencies worked together as the investigation developed and progressed. Information obtained during July and August 2010 eventually led to the federal charges against Mitchell for fraud violations, although the investigation remained a joint State and federal investigation for an extended period of time (Tr. 1 at 10, 33-34, 115, 206).

Mitchell was released from incarceration in mid-to-late 2010, only to have two new State warrants issued for his arrest.  On December 16, 2010, a State court warrant was issued for the arrest of Donald Heflin Mitchell, for grand theft of two tires from Tire Kingdom on December 5, 2010 in Jacksonville, Florida (Gov't Ex. 5).  The affidavit for the arrest warrant lists Amy Newby as the "suspect's attorney."  *Id.*  On December 21, 2010, a second State court warrant was issued for the arrest of Donald Heflin Mitchell, for grand theft of

brake services from Midas Brakes on October 21, 2010 in Jacksonville, Florida (Gov't Ex. 6). The affidavit for the arrest warrant states Ms. Amy Newby arrived at the Midas store and advised she was Mitchell's attorney. *Id.* The affidavit alleges that while the manager was distracted by the suspect's attorney, Mitchell left the area in the vehicle on which the brake services were performed. *Id.*

Around midmorning on December 28, 2010, Detective Dave Bisplinghoff of the Jacksonville Sheriff's Office (JSO) was standing outside of the police station when he observed Mitchell drive past him in a silver Maserati on Adams Street (Tr. 1 at 12-13, 66-68).[4] Bisplinghoff recognized Mitchell from having previous encounters with him (Tr. 1 at 30). Knowing that two arrest warrants were outstanding for Mitchell, Detective Bisplinghoff immediately got into his vehicle and followed Mitchell to the nearby law offices of attorney William J. Sheppard (Tr. 1 at 13). Mitchell parked at a meter on the street and went into the law office building. *Id.* Bisplinghoff had initiated a radio call for back-up when he saw Mitchell exit the building (Tr. 1 at 13-14). A dispatch went out asking for an officer to render assistance to Detective Bisplinghoff (Tr. 1 at 63). Bisplinghoff took Mitchell into custody just as patrol officer M.S. Lundquist arrived on the scene in his JSO marked vehicle. *Id.*

Bisplinghoff advised Mitchell he was under arrest on the two outstanding grand theft warrants (Tr. 1 at 14). Mitchell gave Lundquist the key to the Maserati so that Lundquist could retrieve Mitchell's identification from the car (Tr. 1 at 15). Having received Mitchell's

---

[4]Since the arrest of Mitchell in December 2010, Detective Bisplinghoff has terminated his employment with the Jacksonville Sheriff's Office and has begun employment with the State Attorney's Office (Tr.1 at 9). Throughout the period of time relevant to Defendant's case, Bisplinghoff remained employed by JSO. *See id.* Therefore, to avoid confusion, the Court will refer to Bisplinghoff as either Detective Bisplinghoff or by his given name throughout this report and recommendation.

permission to enter the car, Lundquist went into the Maserati and obtained Mitchell's identification from a bag in the back seat (Tr. 1 at 63-64).  Lundquist returned the Maserati key to Mitchell, which went with him as personal property to the jail, as did two cellular phones and other miscellaneous items (Tr. 1 at 16, 130; Gov't Ex. 7).

The morning of December 29, 2010, Detective Bisplinghoff contacted the State Attorney's office, which directed that the Maserati be seized because the stolen tires were allegedly on the car (Tr. 1 at 18-20).  Detective Bisplinghoff went to the location where the Maserati was parked, verified the VIN number of the vehicle matched the VIN on the General Offense / Incident Report of the grand theft from Tire Kingdom, and eyeballed the tires on the Maserati to verify the tires stolen from Tire Kingdom were on the vehicle (Tr. 1 at 19-20, 53-57; Defendant's Ex. 2; Defendant's Ex. 3; Gov't Ex. 9).  Bisplinghoff then obtained the key to the Maserati from the inmate personal property room at the jail, called for a tow truck to move the Maserati from the parking spot on the street to the city impound warehouse, and returned to the site where the vehicle was parked (Tr. 1 at 18-21).  Bisplinghoff impounded the Maserati as evidence of the grand theft of tires from the Tire Kingdom and the vehicle was moved to the warehouse (Tr. 1 at 21-23, 34-34, 41-44; Tr. 2 at 20-28; Defendant Ex. 12).[5]  An inventory search of the contents inside the Maserati

---

[5] Detective Bisplinghoff testified the Maserati was towed by city wrecker to the impound warehouse (Tr. 1 at 198-99).  Detective Gonzalez, who works at the impound warehouse and assisted in the inventory search of the vehicle, testified he could not remember the mode of transportation by which the Maserati came to be in the warehouse (Tr. 2 at 22).  Of the two drivers who operate the city wreckers used to tow vehicles for the JSO, one testified he did not tow the Maserati and one testified he could not recall towing the Maserati, but normally an outside wrecker service would be used to tow "the more exotic cars" that "sit lower to the ground" (Tr. 2 at 33-39, 43-46).  Detective Martin Chapman, who also is assigned to the city impound warehouse, testified review of the records revealed the Maserati had been towed to the warehouse by a city wrecker (Tr. 1

was conducted at the impound warehouse (Tr. 1 at 24-26).

On December 29, 2010, JSO Detective David Gonzalez of the forfeiture unit at the city impound warehouse assisted in the inventory search of the Maserati (Tr. 2 at 20-28). Detective Gonzalez was unable to recall or verify whether the vehicle was driven to the warehouse or was towed, but confirmed he assisted in the inventory search (Tr. 2 at 20-23).  The items retrieved from the Maserati during the inventory search included, among other things, two iPads with air cards, four Visa debit cards, a USAA teller check, a BB gun rifle, a BB gun pistol, and $177.46 in United States currency (Tr. 1 at 25).  The records kept by the impound warehouse reflected that someone other than Mitchell owned the Maserati at the time it was impounded (Tr. 1 at 176; *see also* Tr. 1 at 218-19).[6]

Attorney Amy Newby was approached by Detective Bisplinghoff and Agent Lomonaco on December 28 or 29, 2010, to inquire whether she would cooperate with law

---

at 168).
  The Court recognizes the mode by which the Maserati was transported to the city warehouse is the subject of dispute between the United States and Defendant.  However, JSO standard policy provides that a vehicle may be either towed into the warehouse or driven to the warehouse by a law enforcement officer (Tr. 2 at 27-28).  Thus, the method of moving the Maserati would not invalidate its removal to the warehouse to preserve evidence of a crime, nor would it invalidate the inventory search conducted at the warehouse.  *See*, *e.g.*, *United States v. Laing*, 708 F.2d 1568 (11th Cir. 1983) (routine inventory search of impounded vehicle is reasonable when conducted pursuant to standard police procedure).

  [6]Detective Bisplinghoff directed someone working at the impound warehouse to take photographs of the tires on the Maserati before the vehicle was released in February 2011 to the owner (Tr. 1 at 57, 218-20).  Those photos were emailed to Bisplinghoff, who retained them within his email account at the JSO.  *Id.*  It is unknown what happened to the photographs upon Bisplinghoff's change of employment from the JSO to the State Attorney's office.  Because the charges had resolved before Bisplinghoff left the JSO, he testified he had no need to print or maintain the photographs (Tr. 1 at 57-58).

enforcement in an ongoing investigation of Mitchell (Tr. 1 at 35-37, 148-50).  Ms. Newby was an attorney of record for Mitchell at that point in time and was initially reluctant to talk to law enforcement officials (Tr. 2 at 10-12; Tr. 1 at 35-37).

On December 31, 2010, Mitchell, then an inmate at the Duval County Jail, made a prepaid call to Amy Newby (Gov't Ex. 1; Doc. #134-1; Tr. 2 at 58-60).  Mitchell and Newby heard, by way of the prerecorded message, that "[a]ll inmate telephone calls are recorded" and "three-way calling is prohibited" (Doc. #134-1 at 1).  Newby had to physically press a number on her phone to accept the call under the described terms.  *Id.*  Early in the conversation, Mitchell requested Newby go to MobileMe and "wipe my phone as quickly as you can" (Doc. #134-1 at 2).[7]  Newby complied (Doc. #134-1 at 6).  During this same phone call, Mitchell also instructed Newby to call another lady named Almashea from her (Newby's) cell phone, which Newby did and proceeded to interact between Mitchell and Almashea (Doc. #134-1 at 6-8; Tr. 2 at 65, 109-110).  This form of three-way calling is prohibited under the terms by which inmates at the jail may make outgoing calls (Tr. 2 at 110).  The substance of the third party call involved Mitchell's directions to Almashea to have USAA cancel the "last package" she sent and to "rewrite another one and send it" (Doc. #134-1 at 7).  During the portion of the call when only Mitchell and Newby were on the phone line, Mitchell inquired what the legal basis could be to require a *Nebbia* hearing

---

[7]MobileMe has been described to the Court as an application for Apple products that permits the user to access the electronic device remotely to view information that is stored on the device, or to direct the deletion of information, such as call records and contact list, from the device (Tr. 2 at 92-93).

for him.[8]  *Id.* at 9.

Calls made by inmates from the Duval County Jail to the outside world are routinely monitored (Tr. 2 at 103).  There is a prerecorded statement at the initiation of all calls from inmates in the jail that states the call is being recorded (Tr. 2 at 89; Doc. #134-1). Telephone communications between inmates and their attorneys can be exempted from the recording if the attorney requests to have his or her calls removed from the recording list.  *Id.*  The removal from the recording list is based on the telephone number provided by the attorney to the jail custodian for the audio records (Tr. 2 at 103-05).  Generally, the telephone number provided by the attorney permanently remains as an exempt phone number from recorded calls.[9]  *Id.*

In addition to advising the phone call from the jail will be recorded, the prerecorded warning statement that plays at the beginning of each inmate initiated phone call tells the caller and the receiver three-way calling is prohibited (Doc. #134-1).  If the inmate calls someone outside the jail and that person uses a cell phone to call someone else and communicate with the third person on a speaker phone, the call is considered an impermissible three-way call (Tr. 2 at 110).

Bisplinghoff and Lomonaco again met with Ms. Newby on January 4, 2011.  The

---

[8]A "Nebbia hearing" is held to inquire into the motives of the surety so as to accurately assess the effect of a bail bond on the defendant's incentive to flee.  *United States v. Nebbia*, 357 F.2d 303, 304 (2d Cir. 1966) (importance is placed on the ability and incentive of the surety to produce the defendant); *United States v. Dussuyer* 526 F. Supp. 883 (S.D. Fla. 1981).

[9]Officer Timothy Holochwost, who testified as the jail custodian for audio records, stated the JSO currently does not have a policy to purge out attorney telephone numbers once they have been entered into the system as exempt from recording (Tr. 2 at 105).

meeting occurred at the offices of the United States Attorney for the Middle District of Florida (Tr. 1 at 35-40, 150-51).[10]  Ms. Newby arrived at the U.S. Attorney's Office without legal counsel and discussed her involvement in the purchase of two luxury automobiles for Mitchell (Tr. 1 at 38-40).  It is alleged in the Superseding Indictment that as part of the conspiracy Mitchell fraudulently obtained luxury automobiles to help create the illusion that he was a legitimate investor.  Superseding Indictment at ¶ 6.

During this meeting, Ms. Newby also gave consent to search the iPhone and two iPads, which she stated belonged to her even though they were found within the Maserati driven by Mitchell (Tr. 1 at 26-28, 104-06, 128-29; *see also* Gov't Ex. 13, Consent to Search Computer Equipment, signed January 5, 2011 by Amy Newby).[11]  Mitchell introduced evidence that as of July  7, 2010 he possessed an iPhone under the alias "Maven Busari" and had taken this phone to an Apple Store for repairs.  Defendant's Ex. 7.  Mitchell's evidence also shows that the email address of record for that iPhone was amynewby@amynewby.com.  *See id.*  Lomonaco testified that AT&T records identified Amy Newby as the owner and bill payer for the iPhone (Tr. 128-29).  The evidence establishes Newby was the owner of the iPhone and iPads and Mitchell may have been an approved user.

Lomonaco read Newby the *Miranda* rights when she met with him and Bisplinghoff at the United States Attorney's Office on January 4, 2011 (Tr. 1 at 150-51).  Agent

---

[10]The record reflects Ms. Newby was likely the subject of a Florida Bar investigation on this date (*see* Tr. 1 at 150-52).

[11]Although the date on the signed document is written as 1/5/10, the parties do not contest that it was actually signed on January 5, 2011 (*see* Tr. 1 at 105, 123-24).

Lomonaco testified he administered those rights because Ms. Newby had been handcuffed earlier that day by another law enforcement agency and he believed it best to advise her of her constitutional rights under the circumstances (Tr. 1 at 151-52). As of January 4, the State Attorney had given Ms. Newby a waiver from prosecution of a State bar charge for an unspecified period of time (Tr. 1 at 223-24). When Ms. Newby spoke with Lomonaco and Bisplinghoff, she was not handcuffed, nor had she been advised she would go to jail unless she cooperated. *Id.*

On February 9, 2011, Mitchell, who had been released on bond from the jail on February 6, telephoned Agent Lomonaco (Tr. 1 at 145-48, 238; Doc. #134-3). During that call, Mitchell gave Lomonaco permission to search the bag that was in the Maserati and "get [his] banking information out of it." *Id.* Mitchell told Lomonaco that he could hold the information "in evidence" if he wanted. *Id.* The next day, February 10, Mitchell again called Agent Lomonaco, this time giving Lomonaco permission to search the iPhone that had been in the bag inside the Maserati (Tr. 1 at 109-112; Doc. #134-4; Doc. #134-5). Mitchell also verified that the two iPads found in the Maserati were purchased by and belonged to Amy Newby. *Id.*

In January and February 2011, Agent Lomonaco identified and interviewed a number of individuals as potential victims in Mitchell's alleged financial investment scam (Tr. 1 at 118-20). The victims were not, however, initially identified through information obtained from either the iPhone or the iPads found in the Maserati (Tr. 1 at 113). At that point in time, Ms. Newby had committed some acts that Lomonaco considered potentially criminal, but he also believed Ms. Newby might have been a potential victim of Mitchell's alleged fraud (Tr.1 at 121).

12

In August 2011, Mitchell pled guilty to the State charge of grand theft of the brake services from Midas, and the grand theft charge of the tires from Tire Kingdom was thereafter dropped (Tr. 1 at 226).  In September 2011, Mitchell was indicted by a federal grand jury on fraud charges (Doc. #1).

## IV. Analysis and Conclusions of Law

Motions to suppress evidence relevant to a criminal trial present mixed questions of law and fact for the court's determination.  *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (internal citations omitted).  The individual moving for suppression of evidence bears the initial burden of persuading the court, through specific factual allegations and supporting evidence, that seizure of the evidence was illegal and that the evidence should therefore be suppressed.  *United States v. Ross*, 827 F. Supp. 711, 716 (S.D. Ala. 1993) (citations omitted).  "Once the movant has established a basis for his or her motion, the burden then shifts to the government to prove by a preponderance of the evidence that the seizure of evidence was legally and factually justified."  *Id.*  A circuit court of appeals reviews the district court's findings of fact under the clearly erroneous standard, but application of the law to those facts is subject to *de novo* review.  *Tobin,* 923 F.2d at 1510.

**Validity of the Impoundment and Inventory Search of the Maserati**

The Fourth Amendment prohibits "unreasonable searches and seizures. . . ."  U.S. Const. Amend. IV.  The Supreme Court has held that what is reasonable depends on "all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985).

Although warrantless searches generally are presumptively unreasonable, there are exceptions in which the government's interest in conducting a warrantless search outweighs the individual's privacy interest. *See*, *e.g.*, *Horton v. California*, 496 U.S. 128, 133 (1990) (finding evidence of a crime in plain view may be reasonably seized without a warrant); *United States v. Gordon,* 231 F.3d 750, 754 (11th Cir. 2000) (finding a *Terry* stop is one exception to warrant requirement).   An inventory search of a legally impounded vehicle presents such an exception.  *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *United States v. Laing*, 708 F.2d 1568, 1570 (11th Cir. 1983) (per curiam).

An inventory search does not run afoul of the Fourth Amendment so long as the search is performed pursuant to explicit and comprehensive police procedures as a means for safeguarding individuals' possessions and protecting the police from false claims. *Bertine*, 479 U.S. at 372; *United States v. Williams*, 936 F.2d 1243, 1247 (11th Cir. 1991). A warrantless inventory search of a vehicle is permissible when executed in accordance with standard police practice.   *Laing*, 708 F.2d at 1570 (internal citations omitted).   An inventory search, however, may not be used as a pretext for intrusive investigatory searches that go beyond the scope of the recognized purposes  to conduct an inventory of the contents of a suspect's vehicle.  *Id.*  Thus, inventory searches may not be conducted for the *primary purpose* of investigating crime.  *United States v. Shirley*, No. 1:10-CR-167-JEC/AJB, 2010 WL 5390138, at *13 (N.D. Ga. Nov. 10, 2010) (citing *Florida v. Wells*, 495 U.S. 1,4 (1990)).[12]  In other words, the search "must not be a ruse for a general rummaging in order to uncover incriminating evidence."  *Id.* (internal quotation marks omitted).  The

_____

[12]Unpublished cases may be cited for persuasive authority in accordance with the Eleventh Circuit Rules.  11th Cir. R. 36-2.

validity of the inventory search hinges on the decision which brought the property into the hands of the police in the first instance.

In cases involving automobiles, this requires examining the legality of the decision to impound the car.  To be valid, the impounding and inventorying of the car must be according to standard criteria and may not be pretext for an investigation.  *United States v. Skinner*, 957 F. Supp. 228, 231-32 (M.D. Ga. 1997).  Evidence that the inventory search in question was undertaken as a standard practice for the involved law enforcement agency is the strongest indicia that an inventory check was conducted for legitimate purposes. *Laing*, 708 F.2d at 1520.  The scope of an inventory search extends to the contents of closed containers found within the vehicle.  *See Bertine*, 479 U.S. at 371-75.  That an inventory search may be expected to turn up evidence of a crime does not vitiate a valid inventory search conducted pursuant to proper protocol and standards.  *Shirley*, 2010 WL 5390138 at *13-14 (internal citations omitted).

In this case, Mitchell was arrested pursuant to two valid warrants and the Maserati was impounded to preserve evidence, namely the two tires that allegedly were taken from Tire Kingdom without payment.  Gov't Exs. 5 & 6; Defendant's Exs. 1-3.  Mitchell does not contest the actual arrest and the Court finds probable cause existed to arrest Mitchell on the outstanding warrants.  *See United States v. Glover*, 441 Fed. Appx. 748, 750-51 (11th Cir. 2011) (finding probable cause existed for arrest even though the defendant was initially stopped because his vehicle did not display a license tag, which was a non-criminal violation).

In *United States v. Ceruti*, 827 F. Supp. 2d 1036 (W.D. Mo. 2011), a somewhat similar factual situation existed at the time of the defendant's arrest, but based on testimony

15

from the arresting officer, the court found the inventory search of the vehicle had no legal basis.  The ruling on the propriety of the inventory search in *Ceruti*, however, is easily distinguishable from the present case.  In that case, police stopped Ceruti because his driver's license had expired and there was an outstanding warrant for his arrest.  Ceruti's vehicle was impounded, towed, and subjected to an inventory search subsequent to Ceruti's arrest.  *Id.* at 1041.  When an officer was questioned as to the basis for towing the vehicle, he testified it was done because Ceruti was under arrest, the vehicle was parked on private property, and it was the practice of the police department to tow a vehicle when making an arrest.  *Id.* at 1043.  Upon examining the towing policy for the Kansas City, Missouri Police Department, the court found there was no legal basis for the tow because the stated reason did not fall within the actual policy of the department.  *Id.* at 1044.

In contrast, the impoundment and towing of the Maserati in this case clearly falls within the policy and practice of the JSO.  JSO standard procedures and Jacksonville Municipal Ordinance 804.1101 explicitly provide for the detention of vehicles "subject to being held as evidence."  Gov't Exs. 8 & 18.  The detective was specifically told to seize the vehicle because the tires were believed to be stolen.  The preservation of evidence of a crime is specifically stated as one of many reasons a vehicle would be towed by JSO.  Although Mitchell argues Bisplinghoff's actions of impounding and inventorying the Maserati were simply a pretext to investigate the contents of the vehicle in furtherance of the ongoing federal investigation (Tr. 1 at 51), the fact remains that the vehicle was impounded and inventoried under standard police procedures after a valid arrest.

In *Cardwell v. Lewis*, 417 U.S. 583 (1974), the Supreme Court was faced with "the issue of the legality, under the Fourth and Fourteenth Amendments, of a warrantless

seizure of an automobile and the examination of its exterior at a police impoundment area after the car had been removed from a public parking lot." *Id.* at 585.   In determining whether the examination of the automobile's exterior, including the tire tread on an operative wheel, invaded the vehicle owner's right to privacy that a warrant requirement was meant to protect, the Court found the "invasion of privacy, if it [could] be said to exist, [was] abstract and theoretical." *Id.* at 592 (citation omitted).   Finding probable cause existed for the arrest of the defendant a day earlier, and probable cause existed to believe Lewis' car had been used in the commission of a crime, the Court determined a warrantless examination of the exterior of a car is not unreasonable under the Fourth and Fourteenth Amendments.   *Id. at* 586-92.   The fact that Lewis' car was impounded before the exterior examination was done did not render the seizure unreasonable or the examination a violation of the Fourth or Fourteenth Amendments.   *Id.* at 592-93.   In the case before this Court, Bisplinghoff had probable cause to arrest Mitchell, probable cause to inspect the tires on the Maserati, and probable cause to impound the vehicle to preserve the evidence of the Tire Kingdom theft.   The initial inspection of the Maserati's exterior was reasonable, as was the subsequent inventory search.

It is not relevant to the Court's findings that a factual dispute exists over the time of day that the vehicle was moved.   Defendant called a surety bond agent to testify that she had seen the Maserati parked on the street the afternoon of the day Mitchell was arrested, but did not see it parked between ten o'clock and eleven o'clock the next morning when she arrived at work (Tr. 1 at 88-91).   Testimony from another of Defendant's witnesses indicated she looked for, but did not see, the Mitchell's car on December 29 when she received a phone call from Amy Newby at 9:54 a.m., asking that she go put money in the

meter for "probably the nicest [car] out there" (Tr. 1 at 93-101).  Bisplinghoff testified the property records receipts showing he retrieved the key to the Maserati from the property room at 11:08 a.m. on December 29 and the Maserati was taken into the impound warehouse at approximately 12:29 p.m. that day were accurate to the best of his knowledge (Tr. 1 at 198-99; *see also* Tr. 1 at 167-77, Testimony of Detective Martin Chapman).  Whether the car was moved before or after ten o'clock the morning of December 29, 2010 does not alter the finding the Maserati was impounded and inventoried as evidence of a crime in accordance with JSO policy and procedures.

Not only was the impoundment of the vehicle in accord with JSO procedures for preserving evidence, but the involved officer also had a right and a duty to protect the Maserati and its contents. *See, e.g.*, *United States v. Staller*, 616 F.2d 1284, 1289-90 (5th Cir. 1980) (finding the police were justified in taking custody of the appellant's car pursuant to their community care taking function because the vehicle was in danger of being stolen or vandalized given that the owner was to be separated from the vehicle for some time);[13] *see also* Gov't Ex. 18 (Jacksonville Municipal Code Sec. 804.1101(d) authorizing the impoundment of a vehicle if the continued presence of the vehicle at its physical location poses a danger to the vehicle itself).  Whether the inventory of the vehicle would lead to discovery of evidence relevant to the federal investigation is irrelevant to the inventory search that was performed in accord with standard operating procedures.  *See Shirley*, 2010 WL 5390138 at *13-14 (collecting cases).  The Court will not delve into the mind of

---

[13]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

the officer so long as the proper objective standards for the otherwise valid inventory search are met.  *See id.*  Standard police protocol was followed in this instance.[14]

**The Attorney-Client Privilege Between Newby and Mitchell**

The attorney-client privilege has been referred to has the "bedrock principle of the adversary system."  *United States v. Lentz*, 419 F. Supp. 2d  820, 826 (E.D. Va. 2005). Under federal law, the attorney-client privilege is known as the oldest of the privileges for confidential communications.  *United States v. Zolin*, 491 U.S. 554, 562 (1989) (internal citation omitted).  However, this privilege attaches only to those "communications made in confidence to an attorney by that attorney's client for the purposes of securing legal advice or assistance."  *In re Grand Jury Investigation*, 842 F.2d 1223, 1224 (11th Cir. 1987) (citations omitted).  The privilege does not apply when the attorney is acting in a ministerial capacity, or as a business agent, rather than a legal adviser.   *United States v. Huberts*, 637 F.2d 630, 640 (9th Cir. 1980).  Moreover, when communications between a client and his attorney are made in furtherance of a future crime or fraud, the attorney-client privilege ceases to apply to those communications.  *Zolin*, 491 U.S. at 562-63.

In this case, Defendant seeks to suppress all records taken from the law office of Amy Newby, all communications made by the Defendant to Amy Newby, and all records taken from the two cellular phones and the two iPads seized by law enforcement from either Defendant's person or vehicle.  Despite Mitchell's allegations to the contrary,  the United States has made it clear that no records were obtained from Amy Newby's law office

---

[14] On these facts and the Court's findings, the Court need not determine whether an expired parking meter justified the towing of the vehicle.

and no records were obtained from either Newby's brother or mother who worked in the office with her (Tr. 2 at 46-51, 79).  Thus, the request to suppress any evidence obtained from Newby's office is rendered moot.  Of the two cell phones that went into the inmate property room at the Duval County Jail, one was an iPhone and the other was not.  There has been no evidence introduced to suggest any information was obtained from the cell phone that was not an iPhone.  The Court is therefore left to consider the question of suppression as to the information obtained from the iPhone and the two iPads, for which Ms. Newby gave her consent to search, and the recorded communications between Newby and Mitchell.

<u>The Recorded Inmate Calls</u>

Mitchell asserts all the communications between himself and Amy Newby are protected under the attorney-client privilege.  The undersigned finds Mitchell's claim overstates the extent of the attorney-client privilege.

Testimony during the two evidentiary hearings establishes that Newby was Mitchell's attorney, plausibly until February 3, 2011 (*see, e.g.*, Tr. 2 at 12).  However, the record also establishes that Mitchell's calls to Newby on December 31, 2010 and January 1, 2011 were made from the Duval County Jail, which has an established policy of recording all outgoing inmate calls and of monitoring many such calls (Tr. 1 at 221; Tr. 2 at 89, 103).  The beginning of every outgoing inmate call is prefaced with a pre-recorded message advising the call will be recorded and third party calls are not allowed (Tr. 2 at 89, Docs. #134-1, #134-2).  The policy is also stated in the inmate handbook (Tr. 2 at 103).  Attorneys have the option of exempting their telephone numbers from the recorded calls (Tr. 2 at 103-08). Having heard the prerecorded statement at the beginning of each outgoing call, both

Newby and Mitchell were aware their phone calls would be recorded.  In fact, Newby was required to consent to the terms of the call being recorded by dialing a number on her phone before the call would be put through (*see, e.g.*, Doc. #134-1).

The extent of the attorney-client privilege is circumscribed by the caveats that the communication must be for the purpose of obtaining legal advice and the communication must have been intended to remain confidential between the client and the attorney.  *See In re Grand Jury Investigation*, 842 F.2d at 1224.  "The burden of establishing the applicability of the attorney-client privilege rests on the party seeking to assert it."  *In re Grand Jury Proceedings*, 616 F.3d 1172, 1183 (10th Cir. 2010) (internal quotation marks and citations omitted).  Thus, Mitchell must establish that his recorded calls to Newby were made by him as the client to his attorney for the purpose of obtaining legal advice or services, with the reasonable expectation that the calls would remain confidential between himself and Newby.  *See United States v. Noriega*, 917 F.2d 1543, 1550 (11th Cir.1990).  For the privilege to apply, Newby must have been acting in her capacity as a lawyer and the communication must not have been related to the commission of a crime or tort.  *See id.*

Under 18 U.S.C. § 2511, no mechanical, electronic, or other device may be used to intentionally intercept any wire communication, including telephone calls, unless a court order has been obtained permitting the intrusion or another statutory exception applies.  *United States v. Freeman*, No. 09-80104-CR, 2010 WL 989227, at *6 (S.D. Fla. Mar. 16, 2010).  The exceptions possibly applicable in this circumstance would be the monitoring and recording of calls by a law enforcement agency in the normal course of its duties or consent to the monitoring and recording.  *See id.* at *7.   As jail officers are also law

21

enforcement officers, the monitoring and recording of outgoing inmate calls pursuant to established policy is within the normal course of the officers' duties. *Id.* The consent to the policy by the inmates may be implied or explicit. *See id.*

Inmate calls made to outside attorneys frequently lose the protection of the attorney-client privilege due to routine recording of such calls, unless measures to protect the attorney-client confidentiality are taken. Courts have often found that "the presence of the recording device is the functional equivalent of the presence of a third party, such that the attorney-client privilege is destroyed." *United States v. Walker*, No. 2:10cr186-MHT(WO), 2011 WL 2728460, at *2 (M.D. Ala. Jul. 13, 2011) (internal citation and quotation marks omitted). Moreover, when an inmate knows, or has reason to know, that a call made to outside counsel call will be recorded, the inmate loses any reasonable expectation of privacy in that call. *See Black v. Attorney General*, No. 6:08-cv-784-Orl-35GJK, 2010 WL 4595661, at *3-4 (M.D. Fla. Nov. 3, 2010) (petitioner for habeas corpus relief on basis of ineffective assistance of counsel had no objectively reasonable expectation of privacy in telephone call since he was warned by automated message that his calls were subject to monitoring and he continued the call involving both his attorney and sister despite the warning).

Here, Mitchell was no stranger to policy and procedure at the Duval County Jail, as he had been previously detained there in July 2010 (Tr. 1 at 30). Detective Bisplinghoff testified he had listened to "hundreds of calls of Mr. Mitchell from our jail" (Tr. 1 at 49). Newby had visited Mitchell at this facility numerous times and, thus, would be at least somewhat familiar with the policies and procedures governing inmate conduct and attorney-client interaction (*see* Tr. 1 at 220). The two calls placed to Newby contained the

22

automated message stating the calls would be recorded (Docs. #134-1, #134-2). Both individuals having heard the automated message, and Newby's action of affirmatively pressing a phone key to accept the calls, obviates any reasonable expectation of privacy between the attorney and client in these two calls because Newby and Mitchell each knew the calls were being recorded. Furthermore, Mitchell and Newby implicitly consented to the recording of the calls by continuing the conversations despite the warning.[15]

Even if the Court were to find Mitchell had a reasonable expectation of privacy in the calls made to Newby, the United States argues and the undersigned agrees, the content of the calls suggests the crime-fraud exception to attorney-client privilege would apply. "[T]he attorney-client privilege does not protect communications made in furtherance of a crime or fraud." *In re Federal Grand Jury Proceedings, 89-10 (MIA)*, 938 F.2d 1578, 1581 (11th Cir. 1991) (internal quotations and citation omitted). For the crime-fraud exception to apply:

---

[15]The facts of this case are easily distinguishable from *Gennusa v. Shoar*, No. 3:09-cv-1208-J-32MCR, 2012 WL 2918487 (M.D. Fla. Jul. 17, 2012), to which Defendant cites as supplemental authority to suppress the recorded phone calls (*see* Doc. #141, Notice of Supplemental Authority). In *Gennusa*, conversations between an attorney and her client were unknowingly recorded while they were in an interview room at the St. John's County Sheriff's Office. *Id.* at *1, *4-7. Although the law enforcement officers knew the interview room was actively monitored and recorded, the plaintiffs, Gennusa and her client, were given no indication of that fact. *Id.* at *1. The plaintiffs sued the sheriff's office for violations of the Fourth Amendment and the Federal Wiretapping Act, 18 U.S.C. § 2510 et seq., in recording the attorney-client conversations. On these facts, the court found the plaintiffs had a subjective expectation of privacy in their attorney-client conversations that society was willing to recognize as reasonable. *Id.* at *4-7. Conversely, in this case, Mitchell was not sitting alone in an interrogation room with his attorney, but was making outgoing calls to his attorney from the Duval County Jail on a phone that he reasonably knew was monitored and the calls recorded. Moreover, Newby had visited Mitchell a number of times at the jail well in advance of this arrest and had more than ample opportunity to submit her phone number as an attorney number to be exempted from recorded calls, but opted not to do so.

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

*Id*. The content of the December 31 phone call indicates Mitchell directed Newby to "wipe [his] phone as quickly" as she could using the MobileMe application and she complied with the request (Doc. #134-1 at 2-3). Under the circumstances of an ongoing investigation for fraud, the actions of Mitchell and Newby in this regard are reasonably construed as possible destruction of evidence. Mitchell directed Newby to place a third party call to another individual, which Newby did despite the warning that three-way calling was prohibited (Doc. #134-1 at 6-8). On the three-way call, Newby falsely told the other lady that Mitchell was out of the country and Newby relayed Mitchell's request that the "package" from USAA be cancelled and she should have USAA "rewrite another one" (Doc. #134-1 at 6-8). It would appear Mitchell was trying to have Almashea write another check. As the evidence introduced during the first hearing demonstrates that a USAA teller check was recovered from the Maserati (Gov't Ex. 10), and the lady on the three-way call, Almashea, was identified as a potential victim of Mitchell's fraudulent scheme (Tr. 1 at 119-20), the actions discussed in this phone call are reasonably construed as actions taken in furtherance of the alleged fraud.

In summary, Mitchell made telephone calls to his attorney discussing, *inter alia*, matters in furtherance of the alleged fraud, when he knew the calls would be recorded by the corrections officers at the jail and he continued with the calls despite that knowledge. Mitchell waived all reasonable expectation of privacy in the phone calls to Newby, which

were undertaken, at least in part, to further criminal activity in which Newby assisted.  Thus, the calls should not be suppressed under the crime-fraud exception to the attorney-client privilege.  Neither should the calls be suppressed since the recordings were made in the normal course of the officers' duties at the jail and Mitchell had full knowledge his calls were not confidential and were, in fact, being recorded.[16]

_Consent to Search the iPhone and iPads_

As a threshold matter, Mitchell must establish a legitimate right of privacy in the electronic devices he claims were illegally searched.  _See Rakas v. Illinois_, 439 U.S. 128, 148-49 (1978); _United States v. Hastamorir_, 881 F.2d 1551, 1559-60 (11th Cir.1989).  Yet, the scope of an individual's privacy rights in objects such as cell phones and computer tablets is not well defined.  _See City of Ontario, California v. Quon_, 130 S.Ct. 2619, 2629 (2010) ("The Court must proceed with care when considering the whole concept of privacy expectations in communications made on electronic equipment. . . "); _United States v. Cole_, No. 1:09-CR-0412-ODE-RGV, 2010 WL 3210963, at *16 (N.D. Ga. Aug. 11, 2010) (the "exact nature and extent" of an individual's reasonable expectation of privacy in the information stored on cell phones remains a subject of debate).  In fact, the scope of an individual's rights who possesses these items is even less clear than the scope of one who owns them.  _See Rakas_, 439 U.S. at 152 (Powell, J., concurring) (in "considering the

---

[16]Although not directly argued by Mitchell, the Court nonetheless finds that Mitchell's statements to Agent Lomonaco during the February 9 and 10, 2011 phones should not be suppressed.  In those instances, Mitchell initiated the telephone calls to the office of a federal government law enforcement agent (Tr. 1 at 107-08, 145).  Mitchell had a history of prior dealings with Agent Lomonaco as far back as 1999 and reasonably knew he was the target of a federal / state investigation that extended beyond his arrest for grand theft (_see_ Tr. 1 at 30-31, 115).  On these facts, Mitchell had no legitimate expectation that his calls to Lomonaco would be private and confidential.

reasonableness of asserted privacy expectations . . . the Court has examined whether the person invoking the protection of the Fourth Amendment took normal precautions to maintain his privacy"); *Hastamorir*, 881 F.2d at 1559 (citing *United States v. Hawkins*, 681 F.2d 1343, 1344 (11th Cir. 1982), for the standard that the court must determine whether the individual has a reasonable *and* legitimate expectation of privacy in the article at the time of the search, *and* consequently whether the Fourth Amendment was actually violated) (emphasis added).   What is clear, however, is that the Court must consider the totality of the circumstances in determining the legitimacy of asserted privacy rights and the propriety of authority when one individual consents to search an object, to which another individual may have an objection to the search. *See United States  v. Zapata*, 180 F.3d 1237, 1241 (11th Cir. 1999) *citing  Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (the court will look at the totality of the circumstances in assessing the voluntariness of the given consent).

     In this case, Amy Newby gave the officers consent to search the iPhone obtained from Mitchell's person on the day of his arrest and the two iPads that were removed from the Maserati with the inventory search (Tr. 1 at 104-06).  Newby represented to Lomonaco and Bisplinghoff that she purchased and owned these items (Tr. 1 at 27, 128-29, 206-07). Mitchell confirmed Newby's ownership of the iPads (Doc. #134-5 at 1-2) and independently told Lomonaco he could search the iPhone and the iPads (Doc. #134-4 at 4; Doc. #134-5 at 2).  Mitchell claims the seizure of these items was illegal and contests the validity of the consents to search these items (Tr. 2 at 50-51).  First Motion at 2-3.  The crux of Mitchell's argument appears to hinge on his assertion that Newby's consent to search was not voluntarily made (Tr. 1 at 204-05).

"To determine whether an individual may challenge a search, the court must decide whether the individual maintains a legitimate expectation of privacy in the object of the search." *United States v. Acosta,* 807 F. Supp. 2d 1154, 1264 (N.D. Ga. 2011) (quoting *Hastamorir*, 881 F.2d at 1559).   To establish a legitimate expectation of privacy in the iPhone and the iPads, Mitchell must prove he had a subjective expectation of privacy in the electronic devices that society is willing to accept as legitimate.  *See Acosta*, 807 F. Supp. 2d at 1264.   Possession of the object of a search may establish a subjective expectation of privacy in the object, but the expectation may or may not be one that society is willing to recognize as legitimate.   *Rakas,* 439 U.S. at 151 (Powell, J., concurring) ("Only legitimate expectations of privacy are protected by the Constitution."); *see also United States v. Miravalles*, 280 F. 3d 1328, 1331 (11th Cir. 2002) (an expectation of privacy is protected by the Fourth Amendment only if society is prepared to recognize that expectation as objectively reasonable); *United States v. Crisp,* 542 F. Supp. 2d 1267, 1275-83 (M.D. Fla. 2008) (determining driver of rented vehicle who was not an authorized driver under the rental agreement and whose license had been revoked had a subjective expectation of privacy in the vehicle that was not a legitimate expectation of privacy under the totality of the circumstances).

When considering an expectation of privacy and authority to consent to search electronic devices such as cell phones, some courts have concluded the cell phone "itself warrants Fourth Amendment protections due to the nature of the privacy expectations bestowed on it by its owner and the public generally."   *United States v. Gomez*, 807 F. Supp. 2d 1134, 1140-41 (S.D. Fla. 2011) (citing *United States v. De La Paz*, 43 F. Supp. 2d 370, 372 (S.D.N.Y. 1999) and *United States v. Finley*, 477 F.3d 250, 259 (5th Cir.

27

2007)).  In *Gomez*, the court determined the initial, warrantless search of the defendant's cell phone was valid under the incident to arrest exception.  *Id.* at 1142-50.  In the instant case, however, the searches of the iPhone and iPads were not made incident to the arrest of Mitchell, but were made after the arrest, subsequent to the consent given by Newby, and most likely prior to the consent given by Mitchell (*see* Tr.1 at 128).[17]  Nevertheless, Mitchell did not take  any precautions to keep the contents of the iPhone and the iPads confidential. In fact, Mitchell told Lomonaco, "I never put a passcode on mine" and "I don't never waste time with passcodes" (Doc. #134-4 at 4; Doc. #134-5 at 2).  Thus, irrespective of whether Mitchell had a legitimate expectation of privacy, the Court must determine the validity of the consent obtained from Amy Newby as the professed owner of the iPhone and iPads.

The voluntariness of a consent must be judged in light of the totality of all the circumstances on a case-by-case basis.  *Schneckloth*, 412 U.S. at 226-27.  Among the relevant facts to be considered are the suspect's custodial status, the presence of coercive police procedure, the extent and level of cooperation with the police, the individual's awareness of his right to refuse to consent to the search, the individual's education and intelligence, the existence of advice as to the nature of the constitutional right implicated, the length of the detention before consent, and the subjective state of the person who consents.  *See Zapata,* 180 F.3d at 1241 (discussing factors for voluntariness of consents under *Schneckloth*); *Tukes v. Dugger*, 911 F.2d 508, 517 (11th Cir. 1990), *cert. denied*, 502 U.S. 898 (1991) (internal citations omitted) (discussing what the court should consider in

---

[17]Agent Lomonaco testified he was "pretty certain" the searches of the iPads and iPhone had been completed, by February 8, 2011 (Tr. 1 at 128) and Mitchell made his calls to Lomonaco on February 9 and February 10, 2011 (Doc. #134-4; Doc. #134-5).

assessing the voluntariness of a consent to search given by the defendant).  The consent

need not be "knowing," in the sense that a person must be told of the right to refuse to

consent; rather, the lack of advice of the right to refuse consent is a factor to be considered

by the Court.  *Schneckloth*, 412 U.S. at 226-234.  The appropriate inquiry is whether "a

reasonable [innocent] person would feel free to decline the officers' requests or otherwise

terminate the encounter."  *Florida v. Bostick*, 501 U.S. 429 ,436 (1990).

In the context of warrantless searches involving objects other than electronic

devices, courts have recognized both the person in possession of the object to be searched

and the owner of the object to be searched may validly consent to the search.  For

example, in *United States v. Harris*, the Eleventh Circuit upheld the trial court's denial of

the defendant's motion to suppress evidence of the gun found in the warrantless search

of the taxi cab in which the defendant was riding.  526 F.3d 1334 (11th Cir. 2008).

Reasoning, without deciding, that the defendant may have had a reasonable expectation

of privacy in the cab, the cab driver's consent to search the vehicle was nonetheless valid

as there was "common authority over or other sufficient relationship to the premises or

effects sought to be inspected."  *Id.* at 1338-39 (internal quotation marks and citation

omitted).

In *United States v. Dominguez-Ramirez*, No. 5:06-CR-6-OC-10GRJ, 2006 WL

1704461 (M.D. Fla. Jun. 8, 2006), during an interview with law enforcement the defendant

gave a conditional consent to search the marital home, while the defendant's wife gave a

general consent to search when the officers arrived at the residence.  The *Dominguez-*

*Ramirez* court determined the wife's unconditional consent was valid, finding there was no

evidence of coercive police tactics and despite minor conflicts between the wife's testimony

29

and the officers' testimony, the wife was present in the home when the search was conducted  and she had clearly signed an "easy to understand" consent form while the officers were still on the premises, although it was signed after the search had been completed.  *Id.* at *6-8.

Here, as in *Harris*, the Court need not determine the scope of Mitchell's asserted privacy rights insofar as the authority of Newby to consent to the searches is found valid and well established.  "An owner of a cell phone generally has a reasonable expectation of privacy in the electronic data stored on the phone."  *United States v. Quintana*, 594 F. Supp. 2d  1291, 1299 (M.D. Fla. 2009) (internal citation omitted).  As either the owner or a person with common authority over iPhone and iPads, Newby's authority to consent was valid if knowingly and voluntarily given.  *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (search for specific objects in a person's home not subject to warrant requirement if owner of the property to be seized or third party with common authority over the premises voluntarily consents to the search); *United States v. Buckner*, 473 F.3d 551 (4th Cir. 2007) (finding defendant's wife had actual authority to consent to search non-password protected areas of home computer leased in her name and apparent authority to consent to search areas protected by defendant's passwords, if any).  It is axiomatic that an owner of objects such as the iPhone and the iPads in question has a legitimate privacy interest in her personal property.  *See Quintana*, 594 F. Supp. 2d  at 1299; *see also United States v. Cole*, No. 1:09–CR–412–ODE–RGV, 2010 WL 3211027, at *15 (N.D. Ga. May 12, 2010) (courts have recognized a reasonable expectation of privacy regarding the information stored in cell phone); *United States v. Sereme*, No. 2:11–CR–97–FtM–29SPC,  2012 WL 1757702, at *9 (M.D. Fla. Mar. 27, 2012) (noting in dicta that an individual does not have

a privacy interest in a cell phone that was not registered in his name or used by him); *United States v. Suarez-Blanca*, No. 1:07-CR-0023-MHS/AJB, 2008 WL 4200156, at *7 (N.D. Ga. Apr. 21, 2008) (collecting cases finding an individual who is not linked to the subscriber of a cell phone has no legitimate privacy interest in that phone).

Moreover, even if Newby did not have actual authority to consent to the searches, the undersigned finds the facts of the case more than adequately demonstrate she had apparent authority upon which the officers could reasonably rely. *See Rodriguez*, 497 U.S. at 185-86. There is no indication in this case that Newby was threatened or coerced into giving consent to search the disputed devices. Although Newby may have been the target of a Florida Bar investigation at the time she gave consent to search the iPhone and iPads, and she may even have been a person of interest in the federal investigation of Mitchell's alleged fraud, the evidence of record establishes she knowingly and willingly gave her consent to search these items.

No evidence was presented that suggests to the Court that Newby was led to believe cooperation in Mitchell's case would impact her apparent legal issues in any way. Newby was a licensed attorney when she gave consent to search and there is no challenge that she did not understand the nature of her consent either when given verbally or in signing the Consent to Search Computer Equipment form. Under the totality of the circumstances, the Court finds Newby's consent to search the iPhone and iPads was knowingly and voluntarily made. Thus, the subsequent search of these items was valid and any evidence obtained therefrom should not be suppressed.

## V.  Recommendation

Thus, for the above discussed reasons, the undersigned respectfully recommends

Defendant's motions to suppress evidence (Docs. #52, #55) be **DENIED.**

**DONE AND ENTERED** at Jacksonville, Florida this 21<u>st</u> day of August, 2012.


_Thomas E. Morris_

THOMAS E. MORRIS
United States Magistrate Judge


Copies to:

The Hon. Marcia Morales Howard

Asst. U. S. Attorney (Robinson)

Noel Lawrence, Esquire