# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                              Case No.  3:11-cr-248(S1)-J-34TEM

DONALD MITCHELL

_____

# O R D E R

**THIS CAUSE** is before the Court on Defendant Donald Mitchell's Motion to Suppress

Evidence (Doc. 52; First Motion), filed on February 20, 2012, Defendant's Motion to

Suppress Evidence (Doc. 55; Second Motion), filed on February 22, 2012, and Defendant's

Authorized Third Motion to Suppress (Doc. 189; Third Motion), filed on November 28, 2012.

The Government filed responses in opposition to the First and Second Motions on March 9,

2012, see United States' Response In Opposition to Defendant's First Motion to Suppress

Evidence (Doc. 66; First Response); United States' Response in Opposition to Defendant's

Second Motion to Suppress Evidence (Doc. 67; Second Response), and to the Third Motion

on December 7, 2012, see United States' Response in Opposition to Defendant's Third

Motion to Suppress Evidence (Doc. 191; Third Response).  Each of the Motions was referred

to the Honorable Thomas E. Morris, United States Magistrate Judge, to conduct an

evidentiary hearing and recommend an appropriate resolution.

With respect to the First and Second Motions, the Magistrate Judge held evidentiary

hearings on May 31, 2012, and June 20, 2012, see Minute Entry (Doc. 112; May Hearing);

Minute Entry (Doc. 129; June Hearing), and on August 21, 2012, entered a Report and Recommendation (Doc. 144; First Report) recommending that the Motions be denied. <u>See</u> First Report at 31-32.  Thereafter, Defendant filed an objection to the Report, <u>see</u> Objection to Report and Recommendation of Magistrate (Doc. 173; First Objection), and the Government responded, <u>see</u> United States' Response In Opposition to Defendant's Objections to the Report and Recommendation (Doc. 177; Response to First Objection).  As to the Third Motion, the Magistrate Judge held evidentiary hearings on December 19, 2012, and January 9, 2013, <u>see</u> Minute Entry (Doc. 194; December Hearing); Minute Entry (Doc. 207; January Hearing), and on February 22, 2013, entered a Report and Recommendation (Doc. 218; Second Report) recommending that the Third Motion be denied.  <u>See</u> Second Report at 15.   On March 11, 2013, Defendant filed an Objection to Report and Recommendation of Magistrate (Doc. 224; Second Objection).  Although given adequate time to do so, the government has not filed any response to Defendant's Second Objection. Accordingly, this matter is ripe for review.

I.    **Standard of Review**

The Court reviews a magistrate judge's report and recommendation in accordance with the requirements of Rule 59, Federal Rules of Criminal Procedure (Rule(s)) and 28 U.S.C. § 636(b)(1).  The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); <u>see</u> <u>also</u> Rule 59(b)(3).  "[I]n determining whether to accept, reject, or modify the magistrate's report and recommendations, the district court has the duty to conduct a careful and complete review." <u>Williams v. Wainwright</u>, 681 F.2d 732, 732 (11th Cir. 1982) (quoting <u>Nettles v. Wainwright</u>,

2

677 F.2d 404, 408 (5th Cir. Unit B 1982)[1]).  Additionally, pursuant to Rule 59 and § 636(b)(1), where a party timely objects[2] to the magistrate judge's report and recommendation, "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1); see also Rule 59(b)(3); Thomas v. Arn, 474 U.S. 140, 149-50 (1985). Nevertheless, while de novo review of a magistrate judge's recommendation is required only where an objection is made[3], the Court always retains the authority to review such a recommendation in the exercise of its discretion.  See Rule 59 advisory committee notes (2005) (citing Thomas, 474 U.S. at 154; Mathews v. Weber, 423 U.S. 261, 270-71 (1976)).

## II.   First Motion

On December 28, 2010, Dave Bisplinghoff, at the time a detective with the Jacksonville Sheriff's Office (JSO), arrested Defendant pursuant to two state court arrest warrants.  Transcript of the May Hrg. (Doc. 127; Tr. I) at 9-14.  One of the arrest warrants related to the theft from a Tire Kingdom of two tires installed on a Maserati.  See May Hrg.,

---

[1]   In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit (including Unit A panel decisions of that circuit) handed down prior to October 1, 1981.  W.R. Huff Asset Mgmt. Co., L.L.C. v. Kohlberg, Kravis, Roberts & Co., L.P., 566 F.3d 979, 985 n.6 (11th Cir. 2009).  After October 1, 1981, "only the decisions of the continuing Fifth Circuit's Administrative Unit B are binding on this circuit. . . ."  Dresdner Bank AG v. M/V Olympia Voyager, 446 F.3d 1377, 1381 n.1 (11th Cir. 2006).  The Court notes that the Fifth Circuit overruled Nettles, in part, on other grounds, in Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc). However, "that does not change the binding effect of Nettles in this Circuit because Douglass was decided after October 1, 1981, and was not a Unit B decision."  United States v. Schultz, 565 F.3d 1353, 1360 n.4 (11th Cir. 2009).

[2]   Both 28 U.S.C. § 636(b)(1) and Rule 59(b)(2) require a party wishing to object to a magistrate judge's recommendation to serve and file any objections within fourteen (14) days of being served with the magistrate's recommendation.  Rule 59 further provides that a "[f]ailure to object in accordance with this rule waives a party's right to review."  Rule 59(b)(2).

[3]   See Rule 59 advisory committee notes (2005) (citing Peretz v. United States, 501 U.S. 923 (1991)).

3

Gov't Ex. 5; Tr. I at 12.  Following Defendant's arrest, an Apple iPhone, among other things, was taken from his person and placed in the jail property room.  Tr. I at 16-17.  The next day, December 29, 2010, Bisplinghoff seized the silver Maserati that Defendant was driving immediately prior to his arrest from the public street where it remained parked following the arrest.  Tr. I at 20-21.  Bisplinghoff impounded the vehicle and, in a subsequent inventory search, found two Apple iPads, as well as other items.  Tr. I at 24-25.  After obtaining consent from Amy Newby, a local attorney who was associated with Mitchell, law enforcement officers later searched the contents of the iPhone and the two iPads.  Tr. I at 26-27, 105-106, 114.  Defendant challenges both the search and seizure of the Maserati, as well as the subsequent searches of the iPhone and iPads.  See generally First Motion; see also Tr. I at 235.[4]

### A.     Search and Seizure of the Vehicle

#### 1.     Summary of the Arguments

In the First Report, Judge Morris determines that Bisplinghoff properly impounded the Maserati according to JSO standard procedures in order to preserve evidence of a crime, and that, following the impoundment, Bisplinghoff conducted a valid inventory search in accordance with standard protocol.  See First Report at 16-19.  Defendant objects to this recommended finding based on his contention that the seizure of Defendant's vehicle was "clearly pretextual."  See First Objection at 11.  Specifically, Defendant notes that

---

[4] The Court will not repeat here the extensive factual background relevant to the Motions as it is in large part set forth in the First and Second Reports. To the extent Defendant objects to the Magistrate Judge's factual findings, or relies on facts not included in the Reports, the Court will address those objections and the relevant facts in its analysis below.

4

Bisplinghoff did not initially tow the vehicle at the time of his arrest on December 28, 2010. Id. Rather, Bisplinghoff impounded the vehicle only after officers at the detention facility where Defendant was incarcerated informed Bisplinghoff that Defendant was concerned about the vehicle and its contents, information they obtained by monitoring Defendant's phone calls.[5] Id. This, Defendant argues, shows that the vehicle was impounded for investigatory purposes. In addition, Defendant maintains that the proffered reason for the tow, the stolen tires, is pretextual because Detective Bisplinghoff made no attempt to "inventory, document, [or] memorialize the tires" on the day he towed the vehicle, and no one at the impoundment lot was aware of the reason the vehicle was towed. First Objection at 11. The government responds that Bisplinghoff had the authority to impound the vehicle because the "Maserati represented evidence of the grand theft." Response to First Objection at 6. Moreover, the government maintains that Bisplinghoff inventoried the vehicle in accordance with the JSO's standard procedures. Id. Therefore, the government contends that the inventory search of the vehicle was proper. Id.

---

[5] Bisplinghoff testified that at the time of Defendant's arrest he told Officer M.S. Lundquist, who assisted him with the arrest, that he "didn't want to have anything to do with what's in that car." Tr. I at 15, 45-46. Bisplinghoff explained that he was familiar with Defendant's demeanor and how he "carries on" and that Defendant "was already making a big scene there." Id. at 45-46. Bisplinghoff testified that he "was serving the two arrest warrants and that's all [he] was there to do." Id. at 46. At the scene, Bisplinghoff turned Defendant over to Lundquist who then booked Defendant in to the Jacksonville Pretrial Detention Facility (the Jail). Id. at 14-16. Bisplinghoff also contacted the State Attorney's Office that same day and notified them that he had executed the arrest warrants and Defendant was in custody, but did not discuss the vehicle. Id. at 18. The following day, Bisplinghoff received a call from personnel at the Jail who informed him that they were monitoring Defendant's phone calls and that Defendant had expressed concerns about the vehicle. Id. at 18, 47. Bisplinghoff then relayed this information to the State Attorney's Office, and was instructed that, because the vehicle had the stolen tires on it, which Bisplinghoff confirmed, he should "tow the car, seize the car because it's got our stolen property on it." Id. at 18, 47, 53-56.

###### 2.   Analysis

The Fourth Amendment protects individuals against "unreasonable searches and seizures."  U.S. Const. amend. IV.  "Ordinarily, the seizure of personal property is per se unreasonable unless the seizure is pursuant to a warrant issued upon probable cause." United States v. Virden, 488 F.3d 1317, 1321 (11th Cir. 2007).  However, courts recognize "'a few specifically established and well-delineated exceptions'" to the warrant requirement. United States v. Johnson, 307 F. App'x 372, 374 (11th Cir. 2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).  One exception, known as the "automobile exception," "permits a warrantless search or seizure 'if (1) there is probable cause to believe that the vehicle contains contraband or other evidence which is subject to seizure under law, and (2) exigent circumstances necessitate a search or seizure.'" Id. (quoting United States v. Alexander, 835 F.2d 1406, 1408-09 (11th Cir. 1988)).  Notably, this exception also applies when the automobile itself, rather than its contents, constitutes contraband which is subject to seizure under the law.  See Florida v. White, 526 U.S. 559, 564-65 (1999) (reasoning that the "need to seize readily movable contraband before it is spirited away," which underlies the justification for the automobile exception in the context of a search, "is equally weighty when the automobile, as opposed to its contents, is the contraband that the police seek to secure"); United States v. Cooper, 949 F.2d 737, 744-48 (5th Cir. 1991) ("[P]olice may seize a car from a public place without a warrant when they have probable cause to believe that the car itself is an instrument or evidence of crime."); United States v. Perkins, No. 12-290, 2013 WL 951586, at *2 (D. Minn. Jan. 11, 2013) ("The automobile exception enables an officer to seize an automobile without a warrant if they have probable cause to believe the

vehicle constitutes or contains evidence of criminal activity." (internal quotation omitted)). As to the second prong of the exception, the Eleventh Circuit instructs that "'the requirement of exigent circumstances is satisfied by the ready mobility <u>inherent</u> in all automobiles that reasonably appear to be capable of functioning.'" <u>United States v. Watts</u>, 329 F.3d 1282, 1286 (11th Cir. 2003) (quoting <u>United States v. Nixon</u>, 918 F.2d 895, 903 (11th Cir. 1990)). Indeed, in <u>Maryland v. Dyson</u>, 527 U.S. 465 (1999) the Supreme Court emphasized that "under our established precedent, the 'automobile exception' has no separate exigency requirement." <u>Dyson</u>, 527 U.S. at 466.  As there is no question that the vehicle at issue here was readily mobile, the Court considers whether Bisplinghoff had probable cause to believe that the vehicle contained, or constituted, evidence of criminal activity.

"Probable cause exists when there is 'a fair probability that contraband or evidence of a crime will be found.'" <u>Virden</u>, 488 F.3d at 1322 (quoting <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989)).  Here, at the time of the seizure, Bisplinghoff knew that a warrant for Defendant's arrest had issued for the theft of two tires that were installed on a Maserati.  Tr. I at 11-13.  On December 28, 2010, the day before he seized the vehicle, Bisplinghoff saw Defendant driving a Maserati.  Tr. I at 12-13.  The next day, prior to towing the vehicle, Bisplinghoff matched the Vehicle Identification Number (VIN) of that Maserati with the VIN number of the Maserati identified in the police report pertaining to the stolen tires.  Tr. I at 53.  In addition, Bisplinghoff observed that two of the tires on the Maserati were the same make as the two tires stolen from Tire Kingdom.  Tr. I at 18-19, 53-56.

Based on the foregoing, Detective Bisplinghoff had probable cause to believe that the Maserati and its tires constituted evidence of the tire theft.  <u>See</u> <u>United States v. Forrest</u>, 620

F.2d 446, 455 (5th Cir. 1980).[6]  As such, Detective Bisplinghoff had the authority to seize the car, without a warrant, from the public street where it was parked.  See id. at 455 ("Once the agents had probable cause to believe these crimes had been committed, seizure of the vehicles without a warrant was permissible."); see also White, 526 U.S. at 561, 564-66 (holding that the Fourth Amendment does not require "the police to obtain a warrant before seizing an automobile from a public place when they have probable cause to believe that it is forfeitable contraband"); United States v. Noster, 590 F.3d 624, 630-31 (9th Cir. 2009) (finding that because officers had probable cause to believe the vehicle was stolen, the warrantless seizure of the truck was reasonable under the Fourth Amendment) (collecting cases); United States v. Patterson, 150 F.3d 382, 385-87 (4th Cir. 1998) (concluding that the warrantless seizure of a car, parked in public, was authorized where police had probable cause to believe the car was an instrumentality or evidence of the crime); Cooper, 949 F.2d at 744-48 ("[P]olice may seize a car from a public place without a warrant when they have probable cause to believe that the car itself is an instrument or evidence of crime.").  Notably, Detective Bisplinghoff's decision to impound the vehicle was also authorized under the JSO's policy and procedures for the towing and storage of vehicles, as well as Jacksonville Municipal Ordinance § 804.1101, which both provide that a vehicle may be towed if it is subject to being held as evidence.  See May Hrg., Gov't Ex. 8 at 2; id., Gov't Ex. 18 at 1.

---

[6]  In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

In the First Objection, Defendant argues that the seizure of the vehicle was unlawful because Bisplinghoff's stated reasons were a pretext for an investigatory motive.  First Objection at 11-12.  Specifically, Defendant relies on the fact that Bisplinghoff did not seize the vehicle immediately upon arresting Defendant, but rather towed the vehicle the following day after learning of Defendant's concern for the vehicle.[7]  Id.  Although the Court is skeptical that such evidence is suggestive of an improper investigatory motive, even if it was, Defendant's argument is still unavailing.  Because Bisplinghoff had probable cause to seize the vehicle when he did so, his subjective intent has no role in the Fourth Amendment analysis.  Whren v. United States, 517 U.S. 806, 813 (1996).  To the extent some Supreme Court cases suggested that the police must act in good faith or without pretext when conducting searches and seizures,[8] the Court in Whren explained that "only an undiscerning

---

[7] Defendant adds that the detective's improper motive is further demonstrated by the fact that he made no attempt to inventory or memorialize the tires.  This argument is not supported by the record.  The tires were affixed to the Maserati which was secured in the warehouse.  See Tr. I at 56-57.  When the Maserati was released to its registered owner in February of 2011, Bisplinghoff had someone at the warehouse take pictures of the tires and send the pictures to him in an email prior to the vehicle's release.  Id. at 57, 218-19, 226.  Although Bisplinghoff did not send the pictures to the state attorney's office, he held on to the pictures as a precaution, reasoning that he would have them if the state needed them.  Id. at 225-27.  Bisplinghoff explains that the tires were not retained when the vehicle was released because "we didn't want to leave the people without transportation.  The tires were now used, so we let the car go."  Id. at 219.  In August of 2011, after Defendant pled guilty to separate charges, the state dropped the tire theft charge.  Id. at 226.  Bisplinghoff ended his employment with the sheriff's office in December 2011, and, seeing no reason to keep the pictures, left them in his email account there.  He believes this email account was deleted following his departure, and therefore the pictures are no longer available.  Id. at 57-58.  Thus, contrary to Defendant's argument, the tires were secured in the warehouse, and then memorialized in pictures, until such time as the related charges against Defendant were dropped, actions which are consistent with Bisplinghoff's explanation that the tires were evidence of the theft.

[8] In Whren, the Supreme Court noted two types of searches where the Court has considered an officer's subjective intent in determining the validity of a search: inventory searches and administrative inspections.  Whren, 517 U.S. at 811.  An administrative inspection is "the inspection of business premises conducted by authorities responsible for enforcing a pervasive regulatory scheme . . . ."  Id. at 811 n.2.  An inventory search is "the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or

(continued...)

reader would regard these cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred."  Whren, 517 U.S. at 811.

In contrast, when police impound a vehicle pursuant to their community care-taking function, probable cause is not required, and as such "the decision to impound a vehicle must be made in good faith, based upon standard criteria and not solely based upon suspicion of evidence of criminal activity."  See United States v. Glover, 441 F. App'x 748, 751 (11th Cir. 2011) (internal quotation omitted); see also Colorado v. Bertine, 479 U.S. 367, 372-73, 375-76 (1987); South Dakota v. Opperman, 428 U.S. 364, 368-69, 375-76 (1976); Whren, 517 U.S. at 811-12.   Defendant's reliance on this principle is unavailing here because community care-taking was not the basis for the impoundment.  Rather, Bisplinghoff had probable cause to believe that the Maserati constituted evidence of a crime, and therefore, his subjective motivations are irrelevant.  Whren, 517 U.S. at 811.

Having found that the vehicle was legitimately seized, Detective Bisplinghoff's subsequent inventory search, conducted in accordance with established procedures, was permissible.  See Cooper, 949 F.2d at 748; United States v. Crawford, 294 F. App'x 466, 472 (11th Cir. 2008) ("[A] warrantless inventory search of a legally impounded car conducted pursuant to an established procedure is valid under the Fourth Amendment.") (citing

---

[8](...continued)
damage."  Id. at 811 n.1.  An inventory search must not be carried out in bad faith, for the sole purpose of investigation, or as a "ruse for a general rummaging in order to discover incriminating evidence."  Id. at 811.  An officer's purpose in conducting a search and seizure matters in this context because "the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, is not accorded to searches that are not made for those purposes."  Id. at 811-12.

10

Opperman, 428 U.S. at 372-73).  Notably, Defendant does not challenge the manner or scope of the inventory search, Tr. I at 235, and the uncontradicted evidence shows that Detective Bisplinghoff conducted the inventory search of the vehicle in accordance with the general impoundment procedures prescribed by the Operational Order of the Jacksonville Sheriff's Office.  See Tr. I at 22-26; see also May Hrg., Gov't Ex. 8 at 2, 5; id., Gov't Ex. 10. To the extent Defendant argues that Detective Bisplinghoff suspected that the vehicle contained other evidence of a crime, such suspicions do not invalidate an otherwise lawful inventory search.  See United States v. Foskey, 455 F. App'x 884, 889 (11th Cir. 2012); Crawford, 294 F. App'x at 473 ("Because [the officer] complied with the vehicle-impound policy and reasonably exercised his discretion under that policy to impound the car, the fact that [the officer] suspected he might find evidence of criminal activity did not convert the inventory search into an investigatory one."); United States v. Grossman, 233 F. App'x 963, 968 (11th Cir. 2007) (per curiam) ("The fact that the agents may have expected to find incriminating evidence in [the defendant's] car does not affect the validity of this search."); United States v. Staller, 616 F.2d 1284, 1290 (5th Cir. 1980).  Accordingly, the Court finds that Detective Bisplinghoff's warrantless seizure and subsequent inventory search of the Maserati did not violate the Fourth Amendment.  See United States v. Khoury, 901 F.2d 948, 958-59 (11th Cir. 1990) ("The inventory search, when conducted according to standardized routine in furtherance of the legitimate goals of the inventory, is an exception to the warrant requirement.").

**B.      Search of the iPhone and iPads**

**1.      Summary of the Arguments**

Defendant next seeks to suppress the evidence obtained from the government's warrantless search of the iPhone, found on Defendant's person at the time of his arrest, and the two iPads, located during the inventory search of the vehicle.[9]  See First Motion at 1; Tr. I at 237.  In the First Report, the Magistrate Judge determined that Newby had actual or apparent authority to consent to the search of the iPhone and iPads, and that she knowingly and voluntarily consented to the searches of those items.[10]  See First Report at 30-31. Defendant objects to this finding and argues that "simply because Newby's name is associated" with the items is insufficient to give her actual or apparent authority to consent to their search.  See First Objection at 12.  In addition, Defendant contends that Newby's "detention in handcuffs, impending arrest on an unrelated but indirectly linked legal matter, and her own interrelated imminent loss of her bar license all combined to make the consent invalid."  Id. at 13.  Defendant maintains that these facts, combined with the fact that Newby was cooperating against an individual she purportedly represented, render her consent involuntary.  Id.  In its Response to the First Objection, the government argues that Newby's consent to the government's search of the iPhone was voluntary, as evidenced by the signed

---

[9] Although Defendant moves to suppress the evidence taken from "two (2) cell telephones" seized at the time of Defendant's arrest, First Motion at 1, the Magistrate Judge found that "[t]here has been no evidence introduced to suggest any information was obtained from the cell phone that was not an iPhone." See First Report at 20.  Defendant did not object to this finding, and therefore, the Court will only address the search of the iPhone.

[10] The Court notes that the Magistrate Judge mistakenly states in his Findings of Fact that the iPhone was found within the Maserati.  See First Report at 11.  This error appears to be inadvertent and harmless given that in the portion of the First Report discussing Newby's consent the Magistrate Judge correctly states that the iPhone was taken from Defendant's person on the day of his arrest.  See First Report at 26.

consent form.  See Response to First Objection at 7.  In addition, the government maintains

that the two iPads were searched pursuant to both Newby's and Mitchell's consent.  Id.

> **2.    Analysis**

In the Report, the Magistrate Judge first addresses the threshold question of whether

Defendant has "a constitutionally protected reasonable expectation of privacy under the

circumstances" in the contents of the electronic devices.  See United States v. Siau, 281 F.

App'x 949, 950 (11th Cir. 2008) (internal quotation omitted); First Report at 25-28.  Notably,

the government does not contend that Defendant lacks a reasonable expectation of privacy

in the objects.  See First Response at 3-4, 7; Response to First Objection at 6-7.  Although

the exact nature and extent of an individual's privacy interest in cell phones and electronic

devices may be unclear, a number of courts have recognized that "individuals retain a

reasonable expectation of privacy in the information stored in their cell phones."  See United

States v. Cole, No. 1:09-CR-0412-ODE-RGV, 2010 WL 3210963, at *16 (N.D. Ga. Aug. 11,

2010) (citing United States v. Finley, 477 F.3d 250, 259 (5th Cir. 2007)); United States v.

Quintana, 594 F. Supp. 2d 1291, 1299 (M.D. Fla. 2009); United States v. Gomez, 807 F.

Supp. 2d 1134, 1140-41 (S.D. Fla. 2011); United States v. McGhee, No. 8:09CR31, 2009

WL 2424104, at *1, *3 (D. Neb. July 21, 2009).  Here, in the absence of any argument to the

contrary, the Court will accept that Defendant has a constitutionally protected expectation

of privacy in the iPhone and iPads at issue.

The Court turns next to the issue of whether the warrantless searches of the iPhone

and iPads were constitutional.  "One of the well-established exceptions to the probable

cause and warrant requirements is a search which is conducted pursuant to voluntary

consent." See United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989).  Valid consent is established where the government demonstrates that the defendant voluntarily consented, "or in the absence of consent by the defendant, [shows] 'that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" See United States v. Marchante, No. 11-11906, 2013 WL 1223477, at *2 (11th Cir. Mar. 26, 2013) (quoting United States v. Matlock, 415 U.S. 164, 171 (1974)); United States v. Zarabozo, 378 F. App'x 939, 941 (11th Cir. 2010) ("To validate a warrantless search, consent must be voluntarily given by a person with the authority to give it or by a person who reasonably appears to have that authority.").  "Even if the third party lacks actual authority to consent to the search, if an officer has an objectively reasonable, good-faith belief that the consent is valid, there is no Fourth Amendment violation." See Zarabozo, 378 F. App'x at 941.  "As with other factual determinations bearing upon search and seizure," the determination of consent to search "'must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?'" See United States v. Sanford, No. 3:06-cr-199-MEF, 2009 WL 2197373, at *4 (M.D. Ala. July 23, 2009) (quoting United States v. Mercer, 541 F.3d 1070, 1074 (11th Cir. 2008)).

In the Report, Judge Morris finds that the searches of the iPhone and iPads were authorized by the consent of Amy Newby.  See First Report at 28-31.  After due consideration, this Court agrees.  Defendant's objection that Newby did not have apparent authority to consent to the search of the items is not supported by the record.  Specifically,

14

prior to the search Newby told Lawrence Lomonaco, a special agent with the United States

Secret Service, that she purchased the iPhone and iPads, and that she owned them.  Tr. I

at 103, 106.  In addition, Lomonaco had previously obtained cell phone records from AT&T

which listed the owner of the iPhone as Newby, with her address, and indicated that Newby

paid the cell phone bill.  Tr. I at 129.  Although the iPhone was seized from Defendant's

person, Lomonaco testified that Newby informed him that she allowed Defendant to use the

phone.  Tr. I at 130.  It also appears that the iPhone was not password protected or locked

in any way.  May Hrg., Gov't Ex. 4A.  In light of the foregoing, Lomonaco reasonably

concluded that Newby had the authority to consent to the search of the iPhone and iPads.[11]

See Sanford, 2009 WL 2197373, at *3-4; United States v. Mathis, 96 F.3d 1577, 1584 (11th

Cir. 1996) (finding that the defendant's mother had authority to consent to the search of the

detached garage where the mother told the officer that the garage was hers); United States

v. Guzman, 507 F.3d 681, 687 (8th Cir. 2007) ("Hare, as the owner of the truck, had

authority to consent to its search.  An owner of a vehicle may consent to its search even if

another person is driving the vehicle."); United States v. Perez, 246 F. App'x 140, 145-46 (3d

Cir. 2007) (finding that the legal owner of the car had authority to consent to search of the

---

[11] Notably, Defendant presents no evidence to suggest that Newby did not have actual authority over the iPads.  Indeed, on February 10, 2011, Defendant told Lomonaco that the iPads belonged to Newby.  See May Hrg., Gov't Ex. 4B.  Although Defendant relies on the fact that one of the iPads was locked with a security code, see First Objection at 5, Defendant's statements to Lomonaco demonstrate that the password was likely placed on the iPad remotely by Newby after it was seized, and that Defendant did not know the password.  See May Hrg., Gov't Ex. 4B ("LL: Alright, what's your passcode?  DM: Uh, I don't have one. [Newby] would have had to put a passcode on there when she locked it and wiped it 'cause I don't never waste time with passcodes.").

car and its contents, despite the evidence that the defendant drove the car more frequently than the owner did).

In addition, Defendant's contention that Newby's consent was not voluntary is entirely without merit. For consent to be voluntary, it cannot "'be coerced, by explicit or implicit means, by implied threat or covert force.'" See United States v. Hall, No. 12-11915, 2012 WL 6050614, at *1 (11th Cir. Dec. 6, 2012) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973)). The question of whether a consent to search was voluntary, as opposed to the product of duress or coercion, is a "question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 228. The Eleventh Circuit instructs that, although none are dispositive, the relevant factors in determining the voluntariness of consent include:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedure; (3) the extent and level of the defendant's cooperation with police; (4) the defendant's awareness of his right to refuse to consent to the search; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

See United States v. Holmes, 270 F. App'x 767, 768 (11th Cir. 2008). It is the government's burden to prove that consent was voluntary. See United States v. Rios, 443 F. App'x 433, 437 (11th Cir. 2011).

In this case, Newby has a law degree, and had been licensed to practice law in the state of Florida since 2003. See Transcript of June Hrg. (Doc. 137; Tr. II) at 10-11. On January 4, 2011, the date Newby gave oral consent to the search, she agreed to go to the U.S. Attorney's Office for an interview, demonstrating a desire to cooperate with the investigators, at least to some degree. See Tr. I at 36-38, 120-21. Although at some point

16

earlier that day a different agency handcuffed Newby in connection with an unrelated investigation undertaken by the Florida Bar, the handcuffs were removed prior to the time when Newby gave consent. See Tr. I at 150-51 Moreover, the record contains no evidence that the officers to whom Newby gave consent threatened force or violence against Newby, or that they were in any way verbally abusive. See Tr. I at 150, 223; see also United States v. Telcy, 362 F. App'x 83, 86 (11th Cir. 2010) (finding consent was voluntary where defendant was in handcuffs and in custody, but where officers did not brandish weapons, threaten defendant, lie to him, or "otherwise unreasonably pressure him into acceding to their request"). Moreover, Newby was well aware of her right to refuse consent given that on January 5, 2011, she signed a written consent form which expressly advised her of her right to refuse consent. See May Hrg., Gov't Ex. 13.

Defendant argues that Newby's consent was not voluntary because she was concerned about her impending arrest on an unrelated legal matter and the loss of her bar license, as well as the "dilemma" of cooperating against a client she represented. See First Objection at 13. However, the pressure Newby may have felt to cooperate simply because she was the target of multiple investigations and in a precarious position, absent any improper coercion by the officers, is not sufficient. See Garcia, 890 F.2d at 362 (finding voluntary consent where defendant was so nervous during his arrest that he soiled his undergarments because "there is simply no evidence that these officers employed any tactics that would augment the degree of coercion that is inherent in any arrest"); see also United States v. Smith, 199 F. App'x 759, 763 (11th Cir. 2006) ("The fact of custody does not necessarily vitiate the defendant's valid consent to a search. Because in any arrest there

17

is present a degree of duress, . . . the question is whether the officers used coercive tactics or took unlawful advantage of the arrest situation to obtain consent." (internal quotations, citations and alterations omitted)).  Defendant presents no evidence that Newby's consent was "merely acquiescence to a claim of lawful authority," extracted with threats or promises by the officers involved, or a result of extraordinary or unlawful police conduct.  See Garcia, 890 F.2d at 361-62.  Thus, the Court finds that Newby's consent to the search of the iPhone and iPads was voluntary.[12]  See id. (finding voluntary consent where fourteen agents were in and around defendant's home, he was arrested and handcuffed, and the agents refused his initial offer of conditional consent); United States v. Espinosa-Orlando, 704 F.2d 507, 512-13 (11th Cir. 1983) (concluding that defendant's consent was voluntary after four agents arrested defendant at gunpoint and ordered him to lie on the grass and then asked for his consent after all but one of the agents had reholstered their weapons); United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993) (holding that consent was voluntary where defendant "was arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint . . .").  In light of the foregoing, the Court concludes that Defendant's First Objection is due to be overruled.  As such, the Court will accept the Magistrate Judge's recommended resolution and deny the First Motion.

---

[12] The Court notes that the government also presented evidence which suggests that Newby had previously attempted to remotely erase the contents of the iPhone and iPads.  See June Hrg., Gov't Ex. 1; May Hrg., Gov't Ex. 4B.  As such, when Newby gave her consent to the search, she likely believed that no information would be found on these devices, and thus, this factor also weighs in favor of a finding that her consent was voluntary.

18

III.    **Second Motion**

While incarcerated, Defendant called Newby from the Jail telephone system on December 31, 2010, and January 1, 2011.  See June Hrg., Gov't Exs. 1-2.  During that time, Newby was representing Defendant in at least one state court criminal matter.  See Tr. II at 11-12.  Outgoing calls placed by inmates from the Jail are routinely monitored.  Tr. II at 103. Participants in a call are warned of this fact by way of an automated message that plays at the beginning of every call.  See Tr. II at 89.  Prior to Defendant's telephone calls to Newby, both Defendant and Newby heard the automated message which stated, among other things, that "[a]ll inmate telephone calls are recorded."  See June Hrg., Gov't Exs. 1-2; see also Notice of Filing (Doc. 134), Exs. 1-2.  Communications between attorneys and their incarcerated clients can be exempt from recording if the attorney requests to have his or her telephone number taken off the recording list.  See Tr. II at 103.  When an attorney makes this request, the inmate phone provider, Global Tel*Link, puts the phone number into a computer system database where it remains permanently.  Id. at 105.  Inmates are informed of this policy by way of the Inmate Handbook, provided to inmates when they complete the booking process, which states in relevant part that: "Any telephone calls made from any Department of Corrections facility will be recorded and may be monitored, with the exception of telephone numbers identified as privileged (i.e., Attorneys who request that calls to their numbers not be monitored or recorded, Public Defender, and Federal Public Defenders Office)."  See Dec. Hrg., Def. Ex. 1.  Notably, the Jail has no policy or procedure in place that notifies attorneys of the ability to have their phone numbers exempted from the monitoring or recording.  See Transcript of December Hrg. (Doc. 200; Tr. III) at 69-70.

19

**A.      Summary of the Arguments**

In the Second Motion, Defendant requests that the Court suppress all records obtained from the law office of Amy Newby, as well as all communications "made by the Defendant to Amy Newby, Attorney at Law, during the course of representation of the Defendant," and any evidence obtained subsequent to the disclosure of the foregoing evidence as "fruits of the poisonous tree." <u>See</u> Second Motion at 1.  Magistrate Judge Morris recommends that the Court deny the Second Motion because the government did not obtain any records from Amy Newby's law office, and because the challenged communications are not protected by the attorney-client privilege. <u>See</u> First Report at 19-25. In his First Objection, Defendant argues that "JSO's actions in recording and monitoring his attorney-client conversations violated the Fourth Amendment and Federal Wiretapping Act, 18 U.S.C. § 2510, et seq." <u>See</u> First Objection at 13.[13]  In its Response, the Government contends that Defendant had no reasonable expectation of privacy in his inmate calls to Newby, and further that those communications are subject to the crime-fraud exception to the attorney-client privilege.  <u>See</u> Response to First Objection at 8-9.

**B.      Analysis**

Defendant's argument with respect to the recorded jail calls between Defendant and Newby presents two issues: whether the calls were recorded in violation of Defendant's Fourth Amendment rights or the Federal Wiretapping Act, 18 U.S.C. § 2510, <u>et</u> <u>seq.</u> (the

---

[13] Defendant does not object to the Magistrate Judge's finding that, to the extent Defendant seeks to suppress records obtained from Newby's law office, such a request should be denied as moot because no records were obtained from that location or from Newby's mother and brother who worked there.  <u>See</u> First Report at 19-20; Tr. II at 46-49, 52.  Accordingly, the Court will adopt this recommendation.

Wiretap Act), and, if not, whether the calls are nonetheless protected by the attorney-client privilege.   After due consideration, the Court agrees with the Magistrate Judge that the answer to both of these questions is no.  See First Report at 19-25.  Therefore, the Court will overrule Defendant's Objection on this issue and deny the Second Motion to Suppress.

"[T]he Fourth Amendment governs not only the seizure of tangible items, but extends as well to the recording of oral statements . . . ." Katz v. United States, 389 U.S. 347, 353 (1967).  However, "[a] telephone call can be monitored and recorded without violating the Fourth Amendment so long as one participant in the call consents to the monitoring."  See United States v. Novak, 531 F.3d 99, 101 (1st Cir. 2008) (O'Connor, J., sitting by designation) (citing United States v. White, 401 U.S. 745, 752 (1971) (plurality opinion)). Similarly, the Wiretap Act "forbids the willful interception of wire communications, including telephone conversations, without prior judicial authorization." United States v. Noriega, 764 F. Supp. 1480, 1490 (S.D. Fla. 1991).  Notably, the statute provides that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding before any court . . . if the disclosure of that information would be in violation of this chapter."  See 18 U.S.C. § 2515.  However, the statute includes an exception which allows for interception where "one of the parties to the communication has given prior consent to such interception."  18 U.S.C. § 2511(2)(c).

In Novak, Justice O'Connor, sitting by designation, addressed a factual situation substantially similar to the one before this Court.  In that case, an inmate made phone calls to an attorney from the county jail in order to obtain his services as a lawyer.  Novak, 531

F.3d at 101.  The jail randomly records and monitors inmate calls.  Id. at 100.  In order to avoid monitoring protected phone calls with attorneys, the jail maintains a list of attorneys whose numbers are exempt from recording.  Id. at 100.  "Inmates can request that officials add the phone number of their attorney to the list so as to exempt all calls made to that number from monitoring."  Id.  The inmate never requested that this attorney's number be added to the list.  Id.  However, "the list is supposed to contain all numbers in the Massachusetts Lawyers Diary and Manual," such that this attorney's number should have been included on the exemption list.  Id.  As fate would have it, the number was erroneously left off the list, and the calls were mistakenly recorded.  Id. at 101.  During the course of these recorded conversations, the attorney agreed to file false affidavits on behalf of the inmate, and also participate in a money laundering scheme.  Id. at 101.  After the attorney was indicted for these crimes, he filed a motion to suppress the recorded jail calls arguing that the monitoring of the phone calls violated the Fourth Amendment.  Id. at 101.

In deciding whether to suppress the phone calls, the Novak court first observed that "[a]t the beginning of every call that [the inmate] made, including those to [the] attorney . . ., he heard an automated message advising him that his calls were being monitored. [The inmate] nevertheless spoke to [the attorney] after having heard the warning."  Id. at 102 (internal footnote omitted).  In addition, the "phones in the jail contain signs which state, 'Calls are subject to monitoring and recording.'"  Id. at 100.  Based on those facts, the court reasoned that "[t]here is little question, given the state of First Circuit precedent, that had [the inmate] spoken to anyone other than an attorney from whom he was seeking legal advice, he would be deemed to have consented to monitoring and recording of his calls."  Id. at 102.

22

As such, the court considered "whether the analysis of [the inmate's] consent changes because he was speaking with an attorney." Id.  Although the court recognized that Massachusetts law prohibited the recording of the attorney-client calls, the court nonetheless concluded that "there is no evidence that [the inmate] was aware of this state regulation, or that he believed his consent to monitoring of phone calls was limited only to non-attorney-client calls." Id. at 102.  Indeed, the court observed that:

> [The inmate] was made aware, both through posted signs and recorded messages, that his calls would be monitored and recorded.  He did not ask prison officials if there was a way to communicate with his attorney without having his calls monitored, nor did he ask either his Federal Defender or [the attorney] himself how to avoid the monitoring of calls.  He did not choose alternate means to communicate with [the attorney], such as by letter or in person.  Instead, [the inmate] initiated telephone calls to [the attorney] and discussed sensitive legal issues, despite the fact that every call he initiated started with a recording stating that the call was subject to monitoring and recording.

Id. at 103.  Under these circumstances, the court found that the inmate had given consent to the recording of his calls.  Id.  Although the Novak court noted that it was "no doubt significant that one of the parties to the conversation in this case is an attorney," the court observed that the significance pertained to the Sixth Amendment's protections, not the Fourth Amendment's prohibition against unreasonable searches and seizures.  Id.  As such, the court concluded that the inmate's "consent, for Fourth Amendment purposes, was adequate to support the monitoring of his calls to [the attorney]."  Id.

Similarly, in this case, Defendant was made aware, through the automated warnings as well as the inmate handbook, that his calls would be monitored and recorded.  Defendant did not ask prison officials or Newby if there was a way to avoid the monitoring, nor did

23

Defendant attempt to have Newby's number added to the attorney list, or inquire of Newby whether she had done so.  Instead, as in <u>Novak</u>, Defendant initiated calls to Newby and discussed his personal affairs with her, despite the fact that every call he initiated started with an automated warning that "all inmate telephone calls are recorded."  <u>See</u> June Hrg., Gov't Exs. 1, 2.  This conduct demonstrates Defendant's consent to being recorded, and therefore, the recording of Defendant's phone calls to Newby did not violate the Fourth Amendment or the Wiretap Act.[14]  <u>See</u> <u>Novak</u>, 531 F.3d at 103; <u>Medina v. Cnty. of Riverside</u>, 308 F. App'x 118, 120 (9th Cir. 2009) ("[Inmates] had actual knowledge of the recording, [based on numerous warnings, including audio recordings and signs,] yet continued their attorney-client conversations.  This actual knowledge provides consent to recording, which vitiates plaintiffs' claims under the [Wiretap] Act and under the Fourth Amendment."); <u>Black v. Attn'y Gen.</u>, No. 6:08-cv-784-Orl-35GJK, 2010 WL 4595661, at *3 (M.D. Fla. Nov. 3, 2010) ("Further, Petitioner consented to the taping of his telephone calls since he was warned by an automated message that his calls were subject to monitoring.  In spite of this warning, Petitioner chose to continue his conversations."); <u>United States v. Colbert</u>, No. 08-411, 2011 WL 3360112, at *8 (W.D. Pa. Aug. 3, 2011) (finding no Fourth Amendment violation "because all of the defendants consented to the monitoring and recording of the calls simply

---

[14] Alternatively, the Court concludes that Defendant did not have a reasonable expectation of privacy in the telephone calls in light of the unequivocal warnings that all calls were recorded.  <u>See</u> <u>United States v. Adams</u>, 321 F. App'x 449, 462 (6th Cir. 2009) ("[Defendants] could not have expected privacy where a message at the start of every telephone call informed the inmates that they had no right to privacy and that their conversation was being recorded and possibly monitored."); <u>Hill v. Donoghue</u>, 815 F. Supp. 2d 583, 588 (E.D.N.Y. 2011); <u>United States v. Speciale</u>, No. 1:10CR61, 2011 WL 921614, at *5 (N.D.W. Va. Feb. 9, 2011) ("Defendant was given advance notice that his phone calls would be monitored and recorded.  By using the telephone knowing the calls would be recorded, Defendant could not possibly have had a reasonable expectation of privacy."); <u>United States v. Morris</u>, No. 07-20, 2008 WL 5188826, at *3-4 (W.D. Pa. Dec. 8, 2008).

by placing them after being put on notice that the calls were subject to monitoring and recording"); see also United States v. Hodge, 85 F. App'x 278, 281 & n.2 (3d Cir. 2003) (holding that because Defendant had adequate notice of the taping of calls he consented to the recording of his conversations) (collecting cases); United States v. Hammond, 286 F.3d 189, 192 (4th Cir. 2002) (concluding that the consent exception to the Wiretap Act applies to prison inmates who are required to permit monitoring as a condition of using prison telephones) (collecting cases); United States v. Freeman, No. 09-80104-CR, 2010 WL 989227, at *6-9 (S.D. Fla. Mar. 16, 2010); United States v. Lamell, No. 2:12-cr-00016-wks, 2012 WL 5285383, at *6 (D. Vt. Oct. 25, 2012); Hill, 815 F. Supp. 2d at 588 ("When a prison gives notice to inmates that their calls may be monitored, inmates' use of the prison's telephones constitutes implied consent for the purposes of [the Wiretap Act].").[15]

While it may be troubling that the Jail makes little, if any, effort to inform attorneys that they can have their telephone numbers excluded from the recording, it does not follow that the lack of knowledge regarding this possibility misleads the inmates or their attorneys into believing that their telephone calls are somehow already excluded from recording.  Justice O'Connor's analysis of the similar circumstances in Novak is persuasive here:

> The question that the parties present to us today is not whether we approve of the methods that law enforcement employed in this case, or whether prisons

---

[15] The Court notes that in Watkins v. L.M. Berry & Co., 704 F.2d 577 (11th Cir. 1983) the Eleventh Circuit cautioned against routinely implying consent to interception from the surrounding circumstances for purposes of the Wiretap Act.  See Watkins, 704 F.2d at 581.  The court instructed that "knowledge of the capability of monitoring alone cannot be considered implied consent."  Id.  However, this case is distinguishable from Watkins in that the automated warning given to Defendant at the start of the calls was not that the calls might be or could be recorded, but unequivocally, that all calls were recorded.  Cf. Watkins, 704 F.2d at 581 (finding no implied consent to monitoring of personal call where plaintiff expressly consented to the limited monitoring of business, not personal calls, and not a general policy of monitoring).

> have authority under either state law or the Sixth Amendment of the United States Constitution to regularly monitor phone calls made between attorneys and their clients. . . .
>
> It is no doubt significant that one of the parties to the conversation in this case is an attorney.  That significance, however, does not arise out of the Fourth Amendment's prohibition against unreasonable searches and seizures. Instead, it is attached to the protections that the Sixth Amendment affords to the attorney-client relationship. [The inmate's] consent, for Fourth Amendment purposes, was adequate to support the monitoring of his calls to [the attorney].

See Novak, 531 F.3d at 102-03.  In sum, Defendant was notified by way of the Inmate Handbook, and automated recordings at the beginning of every call, that all telephone calls were recorded, yet he decided to call his attorney and carry on a conversation with her anyway.  These facts demonstrate Defendant's consent to the recording of the calls for purposes of the Wiretap Act and the Fourth Amendment.

Having determined that the government lawfully obtained these recordings, the Court next considers whether the phone calls are nevertheless protected by the attorney-client privilege.  "The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential." See United States v. Schaltenbrand, 930 F.2d 1554, 1562 (11th Cir. 1991).  The Eleventh Circuit has set forth a two-part analysis to determine when the attorney-client privilege protects a communication between an attorney and his client from government intrusion. See United States v. Noriega, 917 F.2d 1543, 1551 (11th Cir. 1990).  Specifically, "[a] communication between an attorney and his client will be protected if it is: '(1) intended to remain confidential and (2) under the circumstances was reasonably expected and

26

understood to be confidential.'" Id.; see also United States v. Landers, No. 1:12-CR-88-TWT-GGB, 2012 WL 6214627, at *4 (N.D. Ga. Nov. 7, 2012).

It is well settled that "disclosures made in the presence of third parties may not be intended or reasonably expected to remain confidential." See United States v. Blasco, 702 F.2d 1315, 1329 (11th Cir. 1983) (quoting United States v. Melvin, 650 F.2d 641, 645 (5th Cir. 1981)). In United States v. Hatcher, 323 F.3d 666 (8th Cir. 2003), the Eighth Circuit reasoned that "[t]he presence of the recording device was the functional equivalent of the presence of a third party." Hatcher, 323 F.3d at 674. The court explained, "[t]he presence of the prison recording device destroyed the attorney-client privilege. Because the inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversations would remain private." Id. Based on similar reasoning, "[s]everal [courts] outside the Eleventh Circuit have held, or strongly support the . . . position that where an inmate is aware that his calls are being recorded, those calls are not protected by a privilege." Landers, 2012 WL 6214627, at *4 (collecting cases). This Court finds the reasoning in Hatcher and Landers persuasive, and concludes that under the circumstances of this case, Defendant's conversations with Newby on the monitored jail phone are not protected by the attorney-client privilege. See Landers, 2012 WL 6214627, at *5; United States v. Lentz, 419 F. Supp. 2d 820, 828 n.16 (E.D. Va. Aug. 22, 2005) ("[A]n inmate's telephone conversations with counsel are not protected by the attorney-client privilege where, as here, the inmate is notified at the outset that the calls are recorded and subject to monitoring.").

In the First Objection, Defendant emphasizes the importance of the attorney-client privilege and the need for such communications to be kept confidential.  First Objection at 14-16.  However, he presents no legal authority to support the proposition that Defendant could possess a reasonable belief that his calls to Newby were confidential, despite the clear and unequivocal warning that all calls were recorded.  Indeed, the presence of clear, unequivocal warnings distinguishes this case from those cases cited by Defendant.  For example, in Gennusa v. Shoar, 879 F. Supp. 2d 1337 (M.D. Fla. July 17, 2012), the court found that the arrestee had a reasonable expectation of privacy in his "attorney-client conversations held in the police interview room."  See id. at 1349.  However, in that case, the arrestee and his attorney were given "no indication" that their conversation was being recorded.  Id. at 1342.  Specifically, "[t]he camera was not obviously recognizable, no signs warned of the possibility of surveillance, and [the arrestee and his attorney] were not told that they were being recorded or monitored."  Id. at 1342 n.1.  Thus, the court's finding that the arrestee and his attorney had an objectively reasonable expectation of privacy in the police interview room under the circumstances of that case is not persuasive here where both Defendant and Newby were expressly warned that all calls were recorded.[16]  Moreover, this

---

[16] The remainder of the cases upon which Defendant relies to argue that he had a reasonable expectation of privacy simply because he was talking to his attorney are distinguishable for the same reason. See Lonegan v. Hasty, 436 F. Supp. 2d 419, 435-36 (E.D.N.Y. 2006) (stating that the defense attorneys were told that the video cameras in the Visiting Area were not recording their conversations with the detainees); Lanza v. State of New York, 370 U.S. 139 (1962) (noting that the conversation at issue was recorded without the knowledge of the prisoner or his visitor); Sowards v. City of Milpitas, No. C-03-3036-JF, 2005 WL 1566540, at *3 (N.D. Cal. July 5, 2005) (stating that "[t]here is no indication in the record that [the officer] informed [the inmate] that he was going to tape record the conversation . . ."); see also Evans v. Inmate Calling Solutions, No. 3:08-cv-00353-GMN-VPC, 2011 WL 7470336 (D. Nev. July 29, 2011) (holding that although it may have been unclear whether the inmate had an expectation of privacy because he was notified that "properly placed" legal calls would not be recorded, inmate's deposition testimony demonstrated that inmate believed the phone
(continued...)

is not a case where Defendant or his attorney were misled to believe that attorney-client calls would not be recorded.  Cf. United States v. Walker, No. 2:10cr186-MHT, 2011 WL 3349365, at *2 (M.D. Ala. July 14, 2011) (finding that the inmate's recorded calls to his lawyer from prison were privileged where the jail's recorded message "explicitly excluded attorney-client calls from being recorded and monitored," such that the inmate and his attorney were not aware that they were being recorded).  Accordingly, the Court concludes that the explicit warning to Defendant that his conversations with Newby were recorded vitiates any argument that he reasonably could have expected the phone calls to remain confidential for purposes of the attorney-client privilege.[17]  In accordance with the foregoing, the Court will

---

[16](...continued)
calls were recorded such that inmate fails to demonstrate a subjective expectation of privacy).

[17] It appears Defendant may also contend that the communications between Newby and Defendant contained on the iPads and iPhone are protected by the attorney-client privilege.  See Tr. II at 46-47.  In the government's Second Response, the government contends that "communications obtained from the iPhone and iPad are not privileged because their disclosure was authorized by both Newby and Mitchell.  See Second Response at 7.  However, although Newby consented to the searches, her consent does not waive the privilege with respect to Mitchell.  See In re von Bulow, 828 F.2d 94, 101 (2d Cir. 1987) ("Of course, the privilege belongs solely to the client and may only be waived by him.  An attorney may not waive the privilege without his client's consent."); see also Noriega, 917 F.2d at 1551 ("It is a bedrock principle that the attorney-client privilege is the client's and his alone." (internal quotations omitted)).  Although Defendant likely waived the privilege with respect to any communications on the iPads when he gave Lomonaco permission generally to "check" the iPads, see May Hrg., Gov't Ex. 4B, his purported consent to the search of the iPhone is arguably limited to the iPhone's history log for the purpose of obtaining a particular telephone number.  See May Hrg., Gov't Ex. 4A.  However, the Court need not resolve the issue of waiver because Defendant has failed to demonstrate that any communications on the iPhone or iPads would be privileged in the first place.  Among other things, Defendant fails to show that the devices contain communications between Newby and Defendant that relate "to a fact of which the attorney was informed . . . for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding . . . ."  Noriega, 917 F.2d at 1550; Schaltenbrand, 930 F.2d at 1562 (instructing that the party invoking the privilege must show that the communications made to an attorney were made to him "confidentially, in his professional capacity for the purpose of securing legal advice or assistance" (internal quotation omitted)).  Defendant's blanket assertion of privilege with respect to all communications between Newby and Defendant is insufficient to invoke the privilege in the absence of any showing that the communications were intended to be confidential and "made for the purpose of securing legal advice."  See In re Grand Jury Subpoena, 831 F.2d 225, 227-28 (11th Cir. 1987) ("[A] party cannot meet its burden of proof with a blanket assertion of privilege . . . .").

accept the Magistrate Judge's proposed resolution and deny the Second Motion to Suppress.[18]

## IV.    Third Motion

In February of 2011, Defendant was arrested pursuant to a state arrest warrant for failure to appear.  Tr. III at 47-48.  On April 13, 2011, a Florida circuit court judge entered an Order modifying the terms of Defendant's incarceration to allow Defendant "to have telephonic privileges for the purpose of contacting possible new defense counsel to represent him" in his criminal case pending in the state court.  See Dec. Hrg., Def. Ex. 3.  On April 29, 2011, Defendant contacted Michele Taylor, who was a private attorney at the time, using the Jail's phone system.  See Dec. Hrg., Gov't Ex. 1, 1A, 2, 2A.  Because Defendant was housed in an isolation cell at the Jail, to place a telephone call a person outside of the cell had to dial the number for him and then hand Defendant the receiver.  See Tr. III at 65, 74-75, 84-85; Tr. IV at 15.  As with the phone calls to Newby, Defendant's phone calls to Taylor were recorded by the Jail's recording system and an automated warning of this fact played at the beginning of the two calls.  See Dec. Hrg., Gov't Ex. 1, 1A, 2, 2A; see also Transcript of January Hrg. (Doc. 209; Tr. IV) at 38-39.

### A.    Summary of the Arguments

In the Third Motion, Defendant requests that the Court suppress "all communications made by Defendant to Michele Taylor, Attorney at Law, during the course of and in

---

[18] Because the Court concludes that Defendant fails to make the necessary showing of confidentiality required to invoke the privilege, the Court need not decide whether the crime-fraud exception applies to these communications.

anticipation of representation of the Defendant" as well as any evidence obtained therefrom as fruit of the poisonous tree. <u>See</u> Third Motion at 1 (internal footnote omitted). Specifically, Defendant contends that the contents of the phone conversations between Defendant and Taylor, which were recorded on the Jail's telephone system, are protected by the attorney-client privilege. <u>See</u> <u>id.</u> at 2. In the Second Report, the Magistrate Judge finds that the recorded telephone calls are not protected by the attorney-client privilege because "Mitchell had full knowledge his calls were not confidential and were, in fact, being recorded and reviewed by law enforcement officials." <u>See</u> Second Report at 14. Defendant objects to this recommendation and argues that these calls are privileged because a Florida circuit court judge ordered that Defendant be allowed to access the jail telephone to obtain legal representation such that the jail personnel knew that Defendant was contacting an attorney, jail personnel actually dialed the calls to the attorney for Defendant, and during one of the calls Taylor reassured Defendant that their conversation was protected by the attorney-client privilege.[19] <u>See</u> Second Objection at 1-2. The government did not respond to Defendant's Second Objection.

---

[19] Although Defendant argues in the Third Motion that the calls should be suppressed based only on the contention that they are privileged attorney-client phone calls, <u>see</u> Third Motion at 3, in his Second Objection, Defendant raises the argument that the calls were obtained in violation of the Wiretap Act and the Fourth Amendment. <u>See</u> Second Objection at 4-7. Although the Court has the discretion to do so, <u>Stephens v. Tolbert</u>, 471 F.3d 1173, 1174 (11th Cir. 2006), the Court is not required to consider arguments not raised in the first instance to the Magistrate Judge. <u>See</u> <u>Williams v. McNeil</u>, 557 F.3d 1287, 1292 (11th Cir. 2009). Here, Defendant gives no explanation for his failure to assert these arguments before the Magistrate Judge. Certainly, Defendant was aware of these arguments given that he previously raised them in his earlier Objections to the First Report, filed two months prior to the Third Motion to Suppress. First Objection at 13-20. Accordingly, the Court declines to consider Defendant's argument that the recording of Defendant's jail calls to Taylor violated the Fourth Amendment or the Wiretap Act. Regardless, even if the Court were to consider these arguments, the Court would find no violation of the Fourth Amendment or the Wiretap Act for the same reasons set forth above with respect to the jail calls to Newby. <u>See</u> <u>supra</u> at Part III.B.

**B.     Analysis**

Upon careful consideration of the record, as well as the Second Report and Second Objection, the Court concludes that the Second Objection is due to be overruled and will adopt the Second Report.  Defendant's attempts to distinguish the jail calls to Taylor from the earlier calls to Newby are unavailing.  It is undisputed that prior to the beginning of each of Defendant's calls to Taylor an automated message played stating, among other things, that "[a]ll inmate telephone calls are recorded."  See Dec. Hrg., Gov't Ex. 1, 1A, 2, 2A.  Indeed, the evidence shows that Defendant was well aware of the Jail's policy in recording all telephone calls not only from the automated warning and the Inmate Handbook, but also from his conversation with Lomonaco wherein Lomonaco told Defendant that he had been listening to some of Defendant's jail calls.  See May Hrg., Gov't Ex. 4A.  Because Defendant was aware that his conversations with Taylor were being recorded, he could not reasonably have expected them to remain confidential.  Landers, 2012 WL 6214627, at *4-5; see supra at pp. 26-29.  Significantly, although Defendant argues that he had a subjective expectation of privacy in those calls, see Second Objection at 5, he presents no evidence to support this contention, and his own statements during the calls demonstrate that he was aware that the calls were recorded.  Dec. Hrg., Gov't Exs. 1, 1A; see also Schaltenbrand, 930 F.2d at 1554 (instructing that the party invoking the privilege bears the burden of proving that the particular communications were confidential).  Moreover, while the state court order and the Jail's dialing procedures demonstrate that personnel at the Jail were likely aware that Defendant was using the telephone to contact an attorney, this evidence does not show that, as a

32

result, Defendant believed that the calls were not recorded, despite the warnings and his own prior experience to the contrary.  Therefore, the evidence before the Court establishes that Defendant did not, nor could he, reasonably believe that his conversations with Taylor were confidential.

Last, under the circumstances of this case, the Court concludes that Taylor's statement to Defendant that the conversation was protected by the attorney-client privilege does not render the conversation privileged.  Although Taylor told Defendant that the conversation was protected, she did not suggest that the conversation was not actually recorded.[20]  Thus, Taylor's statement appears to be a mistake of law with respect to the application of the attorney-client privilege to her recorded conversations with Defendant.  Mistakes of law cannot transform an unprivileged conversation into a privileged one.  See In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 923-24 (8th Cir. 1997); Lentz, 419 F. Supp. 2d at 828 n.16.  Regardless, Defendant fails to present any evidence that he relied on Taylor's assurances.  Indeed, Defendant rejected Taylor's suggestion that the conversation was privileged with the statement, "Oh God they don't care about that," see Dec. Hrg., Gov't Ex. 1, and he continued to speak in guarded language during the remainder

---

[20] It is unclear to the Court whether Taylor believed that, despite the automated warning, the conversation was not actually recorded, or, that the conversation was protected despite the recording.  Tr. III at 18.  Taylor's confusion appears to stem from her experience working as a public defender prior to entering private practice.  Id. at 14-15.  When she worked at the Public Defender's Office, Taylor knew that her calls with clients "were excluded," id. at 26, and her telephone conversations with clients had never been used against them.  Id. at 20.  However, while Taylor was a public defender, when she spoke with incarcerated clients she did not hear the automated warning in her calls.  Id. at 26-27.  In contrast, it is undisputed that she heard the automated warning at the beginning of her initial telephone conversation with Defendant.  Id. at 26.  Regardless, while Taylor may have been reasonably confused, these facts do not show that Defendant had any reason to believe that his telephone calls to Taylor would not be recorded.

of the calls.  See Dec. Hrg., Gov't Ex. 1-2.  As such, Defendant has not established that he communicated with Taylor under circumstances that he "reasonably expected and understood to be confidential."  Noriega, 917 F.2d at 1551.  Because Defendant was well aware that his conversation with Taylor was recorded and likely monitored, just as with Newby, Defendant had no reasonable expectation that the calls were private or confidential. Accordingly, the Court will overrule Defendant's Second Objection, adopt the Magistrate Judge's Second Report, and deny the Third Motion to Suppress.  In accordance with the foregoing, it is

> **ORDERED:**

> 1.   Defendant's First Objection to Report and Recommendation of Magistrate (Doc. 173) is **OVERRULED**.

> 2.   The Magistrate Judge's recommended resolution in the First Report and Recommendation (Doc. 144) is **ADOPTED** as set forth in the body of this Order.

> 3.   Defendant's First Motion to Suppress Evidence (Doc. 52) is **DENIED**.

> 4.   Defendant's Second Motion to Suppress Evidence (Doc. 55) is **DENIED**.

> 5.   Defendant's Second Objection to Report and Recommendation of Magistrate (Doc. 224) is **OVERRULED**.

> 6.   The Magistrate Judge's Second Report and Recommendation (Doc. 218) is **ADOPTED**.

7.      Defendant's Authorized Third Motion to Suppress (Doc. 189) is **DENIED**.

**DONE AND ORDERED** at Jacksonville, Florida, this 22nd day of July, 2013.

**MARCIA MORALES HOWARD**
United States District Judge

lc11
Copies to:

Hon. Thomas E. Morris
Counsel of Record